787 A.2d 394

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Jose DeJESUS, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 13, 2001.

Decided Dec. 31, 2001.

418

Joseph Marinaro, Philadelphia, for J. DeJesus.

Catherine Marshall, Philadelphia, Robert A. Graci, Harrisburg, for Commonwealth of PA.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

CAPPY, Justice.

This is a direct review of a sentence of death imposed by the Court of Common Pleas of Philadelphia County.[1] For the reasons that follow, we affirm the judgment of sentence.

The Appellant, Jose DeJesus, was arrested and taken into custody on September 23, 1997 for other crimes. On October 30, 1997, Appellant was arrested and gave a statement to the police in this case. Appellant was charged with two counts of murder,[2] two counts of aggravated assault,[3] possession of an instrument of crime,[4] criminal conspiracy,[5] and reckless endangerment of another person.[6] Appellant's trial began on July 26, 1999. On August 5, 1999, the jury found him guilty of two

1. *See* 42 Pa.C.S. §§ 722(4), 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. § 2702.
4. 18 Pa.C.S. § 907.
5. 18 Pa.C.S. § 903.
6. 18 Pa.C.S. § 2705.

counts of first degree murder, and all related offenses. Following the penalty phase, the jury also returned a verdict of the death penalty on each count of murder, finding four aggravating circumstances [7] and no mitigating circumstances. On August 17, 1999, the Court of Common Pleas of Philadelphia County formally sentenced Appellant to death, and additionally sentenced him to serve twenty to forty years for aggravated assault, two and one-half to five years for possessing an instrument of crime, and ten to twenty years for conspiracy, all to run consecutively.[8] Appellant's post-trial motions were denied. This appeal followed.

Although Appellant does not challenge the sufficiency of the evidence with regard to his first degree murder convictions, we are required to undertake an independent review of the sufficiency of the evidence in all capital cases. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1314 (1995).

In order to sustain a finding of first degree murder, the evidence must establish that a human being was unlawfully killed, that the accused did the killing, and that the killing was done in an intentional, deliberate and premeditated way. 18

7. The aggravating circumstances found by the jury were:. that Appellant was paid by another person for the killing of the victim, 42 Pa.C.S. § 9711(d)(2); that Appellant knowingly created a grave risk of harm to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7); that Appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and that Appellant had been convicted of another murder either before or at the time of the offense at issue, 42 Pa.C.S § 9711(d)(11).

8. Appellant received no sentence for the conviction of recklessly endangering another person since it is a lesser included offense of aggravated assault.

Pa.C.S. § 2502(a), (d); *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991). It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of the crime. *Commonwealth v. Smith*, 548 Pa. 65, 694 A.2d 1086, 1088 (1997), *cert. denied*, 525 U.S. 847, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). The prosecution may prove the elements of the offense, including the requisite intent, through circumstantial evidence. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 449 (1998). We have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 95(Pa.), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). Moreover, under the doctrine of transferred intent, the intent to murder may be transferred where the person actually killed was not the intended victim. 18 Pa.C.S. § 303(b)(1); *Commonwealth v. Gaynor*, 538 Pa. 258, 648 A.2d 295, 298 (1994); *Commonwealth v. Gibbs*, 533 Pa. 539, 626 A.2d 133, 138 (1993).

██ The evidence that gave rise to Appellant's convictions for first degree murder was as follows. In May of 1997, Elias Pagan was a drug dealer who controlled drug sales at the corner of 8th and Birch Streets in Philadelphia. Pagan lived on Rorer Street with Aileen "Hazel" Centano, his common-law wife. Carlos "Guatauba" Robelos, Arisbel "Millo" Ortiz, Jonathan "Bolle" Hernandez, George Roman, and Angel Pabon sold drugs for Pagan.

Felix "Chino" Vargas was a rival drug dealer who controlled the corner of Franklin and Cambria Streets. Vargas had recently shot Robelos. Robelos had vowed to kill Vargas. Pagan told Robelos that he would pay him for killing Vargas. Robelos offered to pay Appellant if he helped kill Vargas.

On May 30, 1997, Roman, Ortiz, Hernandez, and Pabon were selling drugs on the corner of 8th and Birch. Pagan went to the corner and told Ortiz to contact him if he saw Vargas. In the late afternoon, Roman, Hernandez, Pabon, Robelos and Appellant were gathered at Pagan's house. They sat at the kitchen table and talked about killing Vargas. Ortiz

telephoned at about 7:00 p.m. to tell them that he had seen Vargas. Pagan responded that it was too early to take action. At around 10:30 p.m., Ortiz telephoned to tell Pagan that he had seen Vargas again. Pagan told Ortiz to come to his house in his car.

Some fifteen minutes later, Ortiz arrived at Pagan's house, driving his small gray Toyota 1.8, with tinted windows and a tilted license plate. Ortiz came inside and Pagan went to the basement. When Pagan came out of the basement, he had with him a large black bag. The bag contained two AK 47 rifles, a .9 millimeter semi-automatic pistol, a .45 caliber semi-automatic pistol, and ski masks. Pagan gave one of the rifles to Robelos and the other to Appellant and the handguns to Pabon and Hernandez, and said "do it right."

At 10:50 p.m. Ortiz, Robelos, Pabon, Hernandez and Appellant left Pagan's house in the Toyota to find Vargas and shoot him. Ortiz was driving, Robelos was sitting in the front seat, and Appellant, Pabon and Hernandez were sitting in the back. Roman left to go to his father's house.

Vargas was a few blocks away at the corner of Franklin and Indiana Streets, sitting in his parked automobile with a friend, Tony Garcia. As an ice cream truck arrived and stopped nearby, Garcia exited the car, and Elizabeth Carrisquilla, who was seven months pregnant, leaned on the passenger window to speak with Vargas. When the Toyota arrived at Franklin and Indiana, Appellant, Robelos, Hernandez and Pabon got out of the car and started shooting at Vargas, who was approximately fifteen feet away.

Oscar Velez was sitting on Franklin Street with friends. He saw a gray, two-door, Toyota 1.8 with tinted windows and a tilted license plate drive by and park in the intersection of Franklin and Indiana. He next saw men wearing black clothes and ski masks get out of the Toyota and start shooting at Vargas' car.

Paula McBride, along with her baby, was on Franklin with Lisa Velez and Martiza Martinez. McBride and Martinez heard noises that sounded like firecrackers and saw bright

lights coming from the corner. As Martinez ran to McBride's house, she felt a burning on the back of her right leg. As McBride leaned over to pick up her baby, she felt a stinging on the top of her head. Both Martinez and McBride had been shot. Lisa Velez, who was near the ice cream truck, heard a noise that sounded like a firecracker and ducked. She peeked around the front of the truck and saw the gray, two door Toyota 1.8 parked in the middle of the intersection, as well as smoke and sparks coming from Vargas' car. She also saw shooters wearing black clothes and face masks. She next observed one of the men with a rifle enter the Toyota as the car pulled away.

When the shooting stopped, Garcia ran to Vargas' car. Vargas was slumped over the steering wheel. Carrisquilla was on the ground, shot in the back. The authorities and medical help were summoned. Vargas was pronounced dead at the scene from multiple gunshot wounds to the head, neck and chest. McBride, Martinez and Carrisquilla were taken to the hospital. McBride and Martinez were treated and survived. Carrisquilla died. Her baby, delivered by Cesarean section, was saved. Projectiles removed by the medical examiner from both Vargas and Carrisquilla were from AK-type firearms.

In the meantime, Ortiz, who had suffered a graze wound to the head, drove to Hernandez's mother's home at 811 Birch Street, along with Hernandez and Robelos. Pagan came out of 811 Birch to take Ortiz to the hospital. Pagan was heard to say "D\* \*n, those n\* \* \* \* \*s just killed Chino." Neighbors saw Pagan, Centano, Hernadez, Pabon, Ortiz, and Robelos celebrating on the street.

At about 11:30 p.m., Roman met with Pagan, Centano, Hernandez, Pabon, Robelos and Appellant in Pagan's home. Pagan told Centano to get the money. Centano retrieved two bundles of cash, each containing $2,500, and gave them to Robelos. Robelos kept one bundle and gave the other to Appellant.[9]

9. Pagan, Centano, Hernandez, and Pabon were arrested, charged, and tried jointly with Appellant. Centano was convicted of third degree

Our thorough review of the record demonstrates that the above-recited evidence is clearly sufficient to support the Appellant's convictions for first degree murder. The evidence establishes that Appellant was present in Pagan's home during the planning of Vargas' shooting, that Pagan gave him a AK 47 rifle and ski mask the night of the murder, that he was one of the men in the Toyota from which Vargas' killers emerged, that he shot at vital parts of Vargas' body with a AK-47 rifle, that fragments recovered from both Vargas and Carrisquilla were consistent with an AK-47 type of rifle, and that he received payment for Vargas' death.

We now turn to Appellant's allegations of error. The first concerns Appellant's assertion that the admission at trial of a statement he gave the police in which he confessed to shooting Vargas for payment violated *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

We begin with the facts relevant to Appellant's confession. The record reveals that Appellant had been arrested, taken into custody, and charged with other crimes on September 23, 1997. In connection with this arrest on September 23rd, Appellant was read his *Miranda* rights and waived them, and gave the police several statements.

By October 30, 1997, Detective John McDermott of the Philadelphia Police Department had secured an arrest warrant for Appellant in the present case. On that day, Detective McDermott and another detective transported Appellant, who had remained in custody, from prison to the Police Administration Building. They placed Appellant in an interview room at approximately 1:00 p.m., at which point, Appellant asked why he was being charged. Detective McDermott advised

murder and related offenses. Pagan, Hernandez and Pabon were convicted of first degree murder and related offenses, and sentenced to life imprisonment. As of the time the parties' respective briefs were submitted in this appeal, Robelos was in custody in Puerto Rico. Ortiz was arrested, pleaded guilty, and testified for the Commonwealth at trial. Roman, who did not participate in the killings, was not charged. In exchange for his testimony in this matter, he entered into a plea agreement in another case. Both Roman and Ortiz gave statements to the police implicating Appellant in the shootings.

Appellant that the authorities had evidence in the form of statements from persons who had implicated him in the Vargas and Carrisquilla shootings. The detectives proceeded to complete the necessary biographical form with Appellant's input. Between 1:00 p.m. and 4:30 p.m., Detective McDermott informed Appellant on several occasions about the charges that the Commonwealth was prepared to bring against him, and told him what Roman and Ortiz had said about him in the statements they had made respectively to the police regarding the shootings. On apparently the last of those occasions, Detective McDermott showed Appellant the statements that Roman and Ortiz had given. At about 4:50 p.m., Appellant told Detective McDermott that he did not shoot Carrisquilla; that he did not want to be blamed for her death; that he shot only Vargas; and that he wanted to set the record straight by making a statement. Detective McDermott advised Appellant that before he could make a statement, he had to be given his *Miranda* warnings. Detective McDermott gave Appellant the appropriate warnings, which Appellant acknowledged and waived, both orally and in writing. Detective McDermott then took down Appellant's statement in question and answer form.

Appellant moved to suppress the statement on the grounds that the police conducted themselves unlawfully by failing to give him his *Miranda* rights when telling him that others had implicated him in the shootings, and by denying him his right to the attorney he had retained. The trial court denied the motion, holding that the statement was unsolicited, a "voluntary response to the police telling [Appellant] what he was being charged with and why"; that as soon as Appellant indicated that he was willing to make a statement, the *Miranda* warnings were given; and that Appellant effectively waived his *Miranda* rights, including his right to have counsel present while being questioned. (Trial Court Opinion at 13–14, 17–18).

The rules that govern our review of the denial of a suppression motion are well-settled. We determine whether the court's factual findings are supported by the record and whether the legal conclusions drawn from them are correct.

*Commonwealth v. Cortez,* 507 Pa. 529, 491 A.2d 111, 112(Pa.), *cert. denied,* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). Where, as here, it is the defendant who is appealing the ruling of the suppression court, we consider only the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the whole record. *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 197 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). If, upon our review, we conclude that the record supports the factual findings of the suppression court, we are bound by those facts, and may reverse only if the legal conclusions drawn therefrom are in error. *Cortez,* 491 A.2d at 112.

■ The legal principles that guide us are also well-settled. As a general rule, the prosecution may not use statements, whether inculpatory or exculpatory, stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

■ "Interrogation" is defined as "questioning initiated by law enforcement officials." *Id.* at 444, 86 S.Ct. 1602. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the United States Supreme Court extended the definition to the "functional equivalent" of express questioning, stating:

 We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in

custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300–01, 100 S.Ct. 1682 (emphasis in original)(footnotes omitted).

The Supreme Court has indicated that *Innis* does not place the police under a blanket prohibition from informing a suspect about the nature of the crime under investigation or about the evidence relating to the charges brought against him. In *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), where it was held that once a suspect has requested counsel in connection with one crime, the police may not interrogate him about another crime until counsel has been provided, the Court said as much. At the same time, however, the Court recognized that communications which provide a suspect with such information may also amount to interrogation under *Innis* by stating: "[E]ven if the police have decided temporarily not to provide counsel ... they are free to inform the suspect of the facts of the second crime as long as such communication does not constitute interrogation, *see* [*Innis,* 446 U.S. at 291, 100 S.Ct. 1682] (1980)." *Id.* at 687, 108 S.Ct. 2093.

██ By focusing a court's attention on a suspect's perceptions and giving relevance to an officer's constructive knowledge, the inquiry that *Innis* provides is necessarily contextual, and must be made on a case-by-case-basis. *Nelson v. Fulcomer,* 911 F.2d 928, 933 (3d. Cir.1990).

██ A defendant may waive his *Miranda* rights, and agree to answer questions or make a statement. *Miranda,*

384 U.S. at 479, 86 S.Ct. 1602. For a waiver to be valid, it must be knowing, voluntary, and intelligent. *Id.* at 444, 86 S.Ct. 1602. In other words, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring,* 479 U.S. 564, 572, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). Prior experience with *Miranda* warnings suggests that a defendant's waiver was knowing and voluntary. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1322 (1995).

 The test for determining the voluntariness of a confession and the validity of a waiver looks to the totality of the circumstances surrounding the giving of the confession. *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1189 (1996). Some of the factors to be considered include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion. *Id.*

 Finally, we have determined that a person accused of a crime who has already engaged counsel may, with full knowledge of his rights but in the absence of counsel, effectively waive his right to have counsel present while he is questioned by the police. *Hall,* 701 A.2d at 197.

We turn first to that part of the trial court's ruling which held that Appellant's statement was admissible because it was Appellant's spontaneous, voluntary response to Detective McDermott's remarks regarding the basis for the charges Appellant faced. Implicit in the trial court's ruling was its rejection of Appellant's contention that Detective McDermott should have provided *Miranda* warnings before making those remarks inasmuch as they were interrogation within *Innis'* meaning.

We conclude that the trial court erred in so ruling. We have no doubt that Detective McDermott's words were intended, as the trial court found, to be informational.[10] This does not mean, however, that the detective's words and actions could not also have been "reasonably likely to elicit an incriminating response" from Appellant, and as such, constituted the "functional equivalent" of the express questioning that the Supreme Court defined as "interrogation" in *Innis*, 446 U.S. at 300, 100 S.Ct. 1682.[11] That is to say, focusing as we must, on Appellant's perceptions, we believe that when Detective McDermott explained to Appellant that he had been implicated in the shootings, telling him what statements Roman and Ortiz had made to the police concerning his involvement, the detective should have known that his comments and conduct were reasonably likely to evoke an effort on Appellant's part to defend himself and give his own version of his involvement in the crimes at issue. Indeed, Detective McDermott testified as much, when the trial court took testimony on the motion to suppress, and later at trial before the jury:

By defense counsel:

10. In response to questions from the trial court, Detective McDermott testified as follows:

By the trial court:
Q: [When you told him of the evidence against him], you hadn't asked anything either, had you?
A: No, Your Honor. We basically [told] him what the case was and what the warrant was about.
Q: So you tell him what the probable cause is essentially within the warrant?
A: Yes.
Q: That included some implications by other people or whatever?
A: Yes.
(N.T. 7/30/99 at 180–81).

11. It is in this regard that the Concurring and Dissenting Opinion misunderstands the Majority Opinion. By no means do we conclude that all declaratory statements by police officers concerning the charges that are brought against a suspect or the evidence that support them are the functional equivalent of interrogation for *Miranda* purposes. Nor do we articulate a *per se* rule to that effect. Rather, it is our position that given the circumstances in a particular case, words or actions on the part of the police relating to the charges a suspect faces or the evidence gathered against him may not only impart information, but may also satisfy the *Innis* test.

Q. Did you intend to question him about this incident when you brought him down from the prison and were processing him for the arrest?

A. It is the same procedure with every defendant. If they are willing to make a statement with regard to the incident that they are being arrested for, we are certainly willing to take it down.

\* \* \*

Q. But you did tell him what some of the other people involved in the case were saying about [his] involvement; is that right?

A. We told him there were other people arrested and that several other people cooperated in the matter he was being implicated.

\* \* \*

Q. You didn't tell him that for the purpose to try and get him to say something to you and respond to that, did you?

A. During a thorough investigation if [Appellant] wants to make a statement about his action, sure, that would be my intention, to talk to him about the case.

(N.T. 7/30/99 at 178, 180).

By defense counsel:

Q: Now, isn't it a fact that you were going in and telling him what these other people had said, so that he would make a statement?

\* \* \*

A: I was hopeful that [Appellant] would give a statement admitting to what he did, yes.

Q: That is why you kept going in and telling him what the other people had said; is that right?

A: That is one of the reasons, yes.

(N.T. 8/2/99 at 71).

▪ Thus, we conclude that when Detective McDermott began informing Appellant of the implicative statements that Roman and Ortiz had made about him, Appellant was subjected to a custodial interrogation. Before doing so, Detective

McDermott should have read Appellant his rights. *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311, 315 (1983). By waiting until after Appellant announced his willingness to confess to provide *Miranda* warnings, Detective McDermott breached *Miranda's* teaching. *See Miranda*, 384 U.S. at 467, 86 S.Ct. 1602. This is because *Miranda's* rule, aimed at insuring that any statement an individual makes is the product of his unfettered choice, can have its intended prophylactic effect only if the warnings are received and understood before the pressures of the interrogation process commence.[12]

■ Nevertheless, we find no merit in Appellant's present claim that the detective's conduct, which violated *Miranda*, tainted and invalidated his subsequent waiver of rights and statement.[13] Under our prior precedent, *see, e.g., Chacko*, 459

**12.** This conclusion is in keeping with our prior holding in *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973). Although *Mercier* pre-dates *Innis*, our analysis anticipated the Supreme Court's definition of the term "interrogation" to include "any words or actions ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

In *Mercier*, the police were investigating a robbery and killing. Robert Mercier voluntarily went to police headquarters. Before Mercier was asked any questions, the police read him the required *Miranda* warnings. At this juncture, Mercier requested the assistance of counsel and refused to answer any questions until counsel was provided. The police left the room. When they returned, they read Mercier the statement that one of the five individuals who had allegedly participated in the robbery and murder had given. The statement implicated Mercier as one of the perpetrators. Mercier then waived his right to counsel, took a polygraph test, and confessed that he had been a lookout.

Relying on our view that " 'any question likely to or expected to elicit a confession constitutes 'interrogation' under *Miranda* ' ", 302 A.2d at 339 (citation omitted), we held that when the police read the statement to Mercier, they engaged in a "form of official interrogation", which was impermissible inasmuch as Mercier had exercised his *Miranda* rights thereby requiring that interrogation cease. *Id.* at 340.

**13.** Our review of Appellant's suppression motion and the record of the suppression hearing reveals that Appellant's argument for suppression was premised solely on the assertion that Detective McDermott's attempt to evoke an incriminating response from him in the absence of *Miranda* warnings was, in and of itself, sufficient to render the statement inadmissible. Appellant did not discuss his subsequent receipt and waiver of his *Miranda* rights, and raises the validity of the waiver for the first time in this appeal. The issue is, therefore, waived.

A.2d at 311, and more recently, under the United States Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), it does not follow that a suspect who was subject to a *Miranda* violation is inevitably disabled from waiving his rights and confessing after he has received the requisite warnings.

In *Elstad,* the Court considered whether *Miranda* required suppression of a properly warned confession because of a prior unwarned admission.[14] The Court began by rejecting the proposition that the "fruit of the poisonous tree" doctrine, which in the context of Fourth Amendment jurisprudence requires the exclusion of evidence or confessions obtained as a result of a constitutional violation unless purged by intervening events of the "primary taint", applies to violations of the *Miranda* decision. *Id.* at 306, 105 S.Ct. 1285. The Court observed that the Fifth Amendment prohibits use by the prosecution in its case in chief "only of *compelled* testimony." *Id.* at 306–07, 105 S.Ct. 1285 (emphasis in original). The Court then noted that *Miranda* can be violated even in the absence of a Fifth Amendment infringement. The Court stated: *"Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional

*Commonwealth v. Baylis,* 477 Pa. 472, 384 A.2d 1185 (1978). However, under the relaxed waiver doctrine that we have applied in capital cases, we will address this issue. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1322 (1995), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996).

We take this opportunity to clarify the narrow scope of Appellant's claim. Appellant's argument makes no mention of the unwarned admissions he made to Detective McDermott when he indicated his desire to give a statement. *See supra,* page 400–01. The Commonwealth did not seek to admit these admissions at trial. The jury heard them, however, when Detective McDermott repeated them in response to questions posed to him by Appellant's defense counsel.

**14.** As we observed, *see supra* n. 13, the unwarned admissions Appellant made prior to giving his warned statement do not figure in his argument. Instead, Appellant essentially complains about the Commonwealth's unwarned questioning. Nonetheless, the principles the Supreme Court articulated in *Elstad* as to the legal significance of a *Miranda* violation which precedes a warned confession admitted in the prosecution's case are broad, and provide a framework for evaluating Appellant's claim. We therefore conduct our analysis along the lines set forth by the Court in *Elstad.*

harm", since under *Miranda,* unwarned statements that were otherwise voluntary within the meaning of the Fifth Amendment must be excluded from evidence. *Id.* at 307, 105 S.Ct. 1285. In the Court's view, therefore, "if errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself." *Id.* at 309, 105 S.Ct. 1285. In this regard, the Court provided:

It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* Thus, the Court concluded that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.*

The Court next turned to the "cat out of the bag" rule, which had been used by some courts to conclude that the giving of an unwarned statement resulted in a subtle form of lingering compulsion that impaired one's subsequent ability to make a voluntary waiver of rights and statement. In disposing of this notion, the Court stated that "[t]his Court has never held that the psychological impact of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver", *id.* at 312, 105 S.Ct. 1285, and concluded that:

absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but un-

warned statement should ordinarily suffice to remove the conditions that precluded admission of the earlier statement. *Id.* at 314, 105 S.Ct. 1285.

Finally, for purposes of determining whether a warned statement made after a *Miranda* violation was voluntary, and is, therefore admissible, the Court cautioned the courts not to establish a fixed standard, such as requiring the passage of time or a break in events, but instead, to look to all of the surrounding circumstances. The Court instructed:

> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Id.* at 318, 105 S.Ct. 1285 (footnote omitted).

It remains to apply these principles to this case. Looking at the totality of the circumstances, we conclude that Appellant's initial, unwarned admissions regarding his involvement in the shootings and desire to make a statement, although the subject of a *Miranda* violation, were voluntary within the meaning of the Fifth Amendment. Likewise, Appellant's subsequent, warned confession was voluntary, the result of his free and rational choice. Nothing about the environment in which Appellant found himself or in the police's manner was oppressive. Appellant does not argue, nor would the record support the contention, that the authorities subjected Appellant to threats, intimidation, deceit, improper inducements or deprivation at any point during his custodial interrogation. Moreover, there is no evidence even to suggest that the authorities took advantage of Appellant's unwarned admissions to pressure him into speaking further. Appellant's

single, unsubstantiated complaint that the time he spent in the interview room could have been shorter does not suffice to establish coercion.

Further, we conclude that Appellant's waiver of rights was knowing, voluntary, and intelligent. Though belated, the reading of Appellant's rights was thorough. Appellant was experienced in the *Miranda* procedure, and was alert and coherent throughout the interrogation. That he fully understood his rights and freely chose to waive them is clearly evidenced by the record. Accordingly, we hold that Appellant's waiver of *Miranda* rights was valid. We therefore reject Appellant's claim that his statement was inadmissible because of Detective McDermott's conduct.

■ Appellant further argues that his statement should have been suppressed because it violated his right to counsel.[15] Appellant claims that the police knew or should have known that he had engaged an attorney in connection with all of the charges he faced on October 30, 1997, and were obliged to notify that attorney when Appellant was transported from prison to the Police Administrative Building.

■ This claim also fails. First, as a matter of fact, the record does not establish that the police had actual or constructive knowledge of Appellant's legal representation in this case. In addition, the evidence does not show that the attorney who apparently represented Appellant in connection with the crimes for which he was arrested on September 23, 1997, had also been retained as of October 30, 1997 for the present offenses. Even assuming that the attorney had been retained,

15. In connection with this claim, Appellant calls upon both the Fifth and Sixth Amendments for the right to counsel. Our careful consideration of his argument and of the case he cites to support it, *Commonwealth v. Santiago*, 528 Pa. 516, 599 A.2d 200 (1991), *cert. denied*, 516 U.S. 1053, 116 S.Ct. 722, 133 L.Ed.2d 674 (1996), reveals, however, that Appellant is invoking the right to counsel that derives from the Fifth Amendment's guarantee against compelled self-incrimination, not the Sixth Amendment right. As we recognized in *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162 (1999), a suspect has no Sixth Amendment right to counsel until the first charging proceeding has transpired. *Id.* at 166. Inasmuch as Appellant had not yet been arraigned at the time he made his statement, he cannot raise a Sixth Amendment claim.

the police were under no obligation to notify him. Appellant did not invoke his right to remain silent nor request that his lawyer be present for questioning. Moreover, Appellant waived his right to counsel. As we observed, the law recognizes that a defendant who has representation may, in counsel's absence, waive his right to counsel's presence during questioning by the police. *Hall,* 701 A.2d at 197. Thus, we conclude that the trial court properly denied Appellant's motion to suppress.

Appellant also contends that the trial court erred in rejecting his claim that the Commonwealth engaged in prosecutorial misconduct on numerous occasions during its closing argument in the guilt phase of the trial. Our review of a trial court's decision to reject a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. *Id.* at 198. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. *Commonwealth v. Washington,* 549 Pa. 12, 700 A.2d 400, 407 (1997), *cert. denied,* 524 U.S. 955, 118 S.Ct. 2375, 141 L.Ed.2d 742 (1998).

Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. *Hall,* 701 A.2d at 198. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. *Id.* Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 514 (1995), *cert. denied,* 519 U.S. 826, 117 S.Ct. 89, 136 L.Ed.2d 45 (1996). In order to evaluate whether comments were improper, we must look to the context in which they were made. *Id.* Finally, when a trial court finds that a prosecutor's comments were inappropriate, they may be appropriately cured by a cautionary instruction to the jury. *Jones,* 668 A.2d at 503–04.

 Appellant first argues that the Commonwealth improperly used co-defendant's Pabon's confession in its closing to bolster the credibility of George Roman, one of its witnesses, as against him. The comment that Appellant finds objectionable is:

> You think of [Centano] and [Pagan] and you think of corroboration, George [Roman] says he sees two weapons, two AKs, and then he sees the .45, but when you hear Mr. Pabon's confession, he says, yes, I had my .9 with me, that's why he says three weapons.

(N.T. 8/4/97, 78–79).

It is difficult to understand from Appellant's argument why he believes this comment prejudiced him. The prosecutor's remarks, when taken in context, refer to the Commonwealth's case against Centano and Pagan. Moreover, even if the passage is interpreted as referring to Appellant, we do not see how it would have negated the jury's ability to render a true and fair verdict. Lastly, the trial court told the jury, both at the beginning and at the end of the case, that arguments made by counsel are not evidence, and issued a cautionary instruction that advised the jury that it was not permitted to use this statement against any of Pabon's co-defendants, an instruction which we presume the jury followed. *Jones,* 668 A.2d at 504.

 Appellant's second claim of misconduct is that the prosecutor in his closing referred to facts not in evidence.[16] Appellant takes issue with the following passages:

> [These guys] are drug abusers. Guys use cocaine and use heroin for the cut, to bring it down, the same way some guys get high, so they can be normal.

(N.T. 8/4/99 at 76).

> Two AKs which are military weapons designed only for one thing, to kill people, not for hunting, it is to kill. A .45 is

**16.** The Commonwealth rightly argues that this particular objection was made by one of Appellant's co-defendants, and that Appellant did not join in this objection. Ordinarily, we would deem this claim waived. *Commonwealth v. Davenport,* 462 Pa. 543, 342 A.2d 67, 75 n. 4 (1975). We will nonetheless address it, under our relaxed waiver doctrine. *See supra* n. 11.

not used for hunting. It is a military weapon used to kill people. A .9 millimeter, the American military has switched from .45 to .9 millimeter. Why? You can handle the round better and it is made to kill people, that's what they did, when you look at this, I wanted to kill them. I wanted to kill them.

(N.T. 8/4/99 at 81).

This claim likewise lacks merit. Appellant's complaint that there was no evidence to support these comments is belied by the record. The prosecutor's remark concerning drug use, cocaine and heroin referred specifically to testimony that Roman gave when he was cross-examined by counsel for one of Appellant's co-defendants. The prosecutor's comment about the military background of the AK–47 was based on the testimony that a ballistics expert called by the Commonwealth gave at trial. His observation that the weapons used the night of the shootings are not for sport was fairly inferred from the testimony of that same expert regarding the operation of the firearms. Moreover, when asked to do so by defense counsel for another defendant, the trial court instructed the jury to disregard any argument with regard to these particular comments that was not based on the evidence.

Appellant next contends that the following passage from the prosecutor's closing was improper because it inflamed the passions of the jury and invited speculation on facts not of record:

Think how the bullet went in and you see the distance. In [Carrisquilla's] back, through her lungs, through her spine, through her aorta and then gets caught there. Think of that and think of when Miss Pene got up and Tonya held her, what is she doing as a mother? She is holding her stomach. She is holding her baby. She is coughing out blood, that's what they did. You see them. Look at them as they smile there, that's what they did. (Indicating). When you think of that child and, thank goodness, at least he survived. May 30th is his birthday and as the grandparents say happy birthday, they are thinking my little girl left

May 30th, so what a feeling to have as a sister, as a parent, happy birthday. My baby is gone, that's what they did and they didn't do it to protect society. They did it because they wanted more money, that is what they did and when you think of a witness who testified, Paula, her baby in her arms and she has to run home and she gets shot in the head, what if she were holding her baby up like this? (Indicating).

How about Miss Pene, she sees the shots. Think of how, as a parent, you feel hurt for your child and you will die for them. She is taking a three-year old boy and sticking him in the gutter, in between a car, that's what they did, so let's talk about these liars and you realize they are not liars. (Indicating).

(N.T. 8/4/99 at 69–70).

Because the prosecutor was fairly commenting on the evidence introduced by the Commonwealth at trial and on the inferences that could be drawn therefrom in this passage, we also reject this contention of error. A medical examiner testified as to the bullet's path through Carrisquilla's body. Bystanders who witnessed the killings or who were shot by stray bullets testified as to what they saw and what steps they took to save themselves or to assist others. As we have noted, a homicide trial is by its nature unpleasant. *Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313, 333 (1998). This one was no exception.

██ Appellant further states that this passage is improper for including victim impact evidence.[17] Because Appellant is not more specific, we can only assume that he complains of the prosecutor's reference to the date of May 30th and its effect on Carrisquilla's parents and child. While the comment may have been intemperate, it was fleeting, when viewed in the context of a closing argument that consists of some forty pages of transcript. Even if it satisfies the definition of such evidence, the remark was not so extensive as to prejudice the

17. Victim impact evidence is defined in the capital sentencing statute as "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim. . . ." 42 Pa.C.S. § 9711(a)(2).

jury to the point that it could not render a true and fair verdict. *Commonwealth v. Fisher*, 559 Pa. 558, 741 A.2d 1234, 1243 (1999). Further, the trial court instructed the jury that its decision had to be based on the evidence, not upon sympathy or the circumstances surrounding the birth of Carrisquilla's son.

Last, relying on our decisions in *Commonwealth v. Tann*, 500 Pa. 593, 459 A.2d 322 (1983) and *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990), Appellant argues that the prosecutor improperly bolstered or vouched for the testimony of Ortiz and Roman, who had entered into a plea agreement with the Commonwealth.

In *Tann*, the defendant, a participant in a violent racial confrontation, was tried for murder. The Commonwealth called Joseph Patterson and Keith Hill, two participants in the violence, to testify against Tann. Patterson and Hill had entered into plea agreements with the Commonwealth, obtaining leniency in exchange for their testimony. At Tann's trial, the Commonwealth also called the attorneys who represented Patterson and Hill to testify about the plea agreements. Patterson's attorney testified that Patterson had been advised of his Fifth Amendment rights against self-incrimination, but had agreed to waive those rights and testify at trial. Hill's attorney testified that in exchange for " 'his [Hill's] testimony, to testify to what he saw on the night in question and *telling the truth* there [would] be no charges of any kind ... brought against him....' " *Id.* at 327 (emphasis added in original).

Tann was convicted of third degree murder. This court reversed and granted Tann a new trial. Finding the testimony of the attorneys irrelevant and highly prejudicial, we concluded that the failure of Tann's lawyer to object to the testimony was ineffective assistance of counsel. Our holding was premised on the principle that where it is likely that the jury will associate a witness with the defendant and the criminal episode giving rise to the charges against the accused, that witness should not be placed on the stand for the

purpose of having him exercise his privilege against self-incrimination before the jury. *Id.* at 328. We stated:

> We believe the same prohibition pertains where the Commonwealth seeks to call to the attention of the jury the fact that a witness, who was associated with the accused in the activity giving rise to the criminal charges, has waived his Fifth Amendment rights against self-incrimination and is taking the witness stand to *tell the truth.*
>
> * * *
>
> In the present case, the Commonwealth's use of this unwarranted tactic could only steer the jury to infer that since its witnesses ... waived their Fifth Amendment rights and *willingly* gave self-incriminating testimony, [their] testimony was the truth and entirely believable.

*Id.* (footnote omitted) (emphasis in original).

In *Bricker,* the defendant was tried for and found guilty of first degree murder, and sentenced to death. The Commonwealth's evidence against the defendant included the testimony of two witnesses, Charles Kellington and Charles Rossi, who testified pursuant to plea agreements. At the Commonwealth's request, the trial court had allowed the plea agreements to be sent out with the jury during its deliberations. Guided by *Tann,* this court determined that the trial court committed reversible error in doing so. We observed that the language in the plea agreements obligated Rossi and Kellington to tell the truth, and that the signatures of law enforcement officials on the documents that formalized the agreements "placed the imprimatur of their offices as support for the proposition that Rossi and Kellington were *telling the truth.*" *Bricker,* 581 A.2d at 154 (emphasis in original). We then stated that "[i]t is beyond question that permitting the prosecution to send these documents out with the jury during deliberations impermissibly bolstered the credibility of Charles Rossi and Charles Kellington," *id.,* and observed that "the introduction of the plea agreements served as silent witness" from which the jury could reasonably infer that the defendant had the same opportunity as Rossi and Kellington to cooperate, and chose to remain silent. *Id.* at 155.

Despite Appellant's assertion, no action on the Commonwealth's part violated the rules we set forth in *Tann* and *Bricker*. The question posed by the Commonwealth to Roman with which Appellant takes issue did not concern Roman's plea agreement or any promise on his part to tell the truth at trial. Rather, it was part of the Commonwealth's effort to provide the jury with background on Roman's contacts with the authorities, and concerned the first of two statements that Roman gave to the police. This statement, as it turned out, was incomplete. Thus, when the prosecution asked Roman "[d]id you tell the police at the time the whole truth about what you knew?" and Roman admitted that he had not, the exchange could not have amounted to improper bolstering. (N.T. 7/28/99 at 44).[18]

Turning to Appellant's claim regarding the Commonwealth's questioning of Ortiz, the record shows that prior to the commencement of trial, Appellant joined in a co-defendant's motion in limine to bar the Commonwealth from asking Ortiz whether one of the conditions of his plea agreement was to "testify truthfully". (N.T. 7/26/99 at 22–23). The trial court granted the motion as to Ortiz's direct testimony, but allowed for the possibility of an appropriate inquiry in this regard on redirect.[19] When Ortiz was testifying on direct that he had pled guilty, the prosecutor asked him whether "[i]n return for [your] deal, did you have to testify truthfully in this case?" (N.T. 7/28/99 at 137). The question, however, went unanswered because the trial court sustained defense counsel's objection.

While it is clear that the question violated the trial court's ruling on the motion in limine, we cannot agree with Appellant that it rose to the bolstering that we have denounced. In our view, this one question from the prosecutor to Ortiz served neither to place the Commonwealth's official sanction on his

18. We note that the trial court sustained an objection to the question, based on its phrasing, and that the trial court had instructed the jury that questions are not evidence and to ignore any matter to which an objection was sustained.

19. The motion in limine and the trial court's ruling also applied to the Commonwealth's examination of Roman.

credibility nor cloak him with the Commonwealth's authority. *Bricker*, 581 A.2d at 154.

■ Finally, Appellant claims that the following statements in the prosecutor's closing were also contrary to our teaching regarding improper bolstering:

> Think of the deal that [Ortiz] got. Twenty to forty years is what I gave him in front of that judge for driving the car. What a great deal. Think of you at this moment that you are going to start serving twenty years of your life for what he did. He is paying for it or he could have taken the gamble and gone to trial but when he sat with his lawyer, you saw that lawyer there.
>
> She sat down and said, baby, this is what we got to do because you are not going to beat this and he says okay, and he took the deal. Twenty to forty, that means he serves twenty years of his life before he has a Parole Board. He cannot come out. He cannot come out.

(N.T. 8/4/99 at 70).

According to Appellant, this passage left the jury with two impermissible inferences: that Ortiz's attorney had usurped the jury's role, determining that all of the defendants were guilty; and that Ortiz was "telling the truth" because a lawyer "told him to take the deal to save his life." (Appellant's Brief at 17). Beyond this assertion, Appellant does not develop his argument further.

This claim also lacks merit. The inferences that Appellant contends arise out of this passage are, in our view, unreasonable. Moreover, we can discern no basis upon which to conclude that the prosecutor's words was impermissible vouching by the Commonwealth for Ortiz's credibility.

■ Finally, having concluded that Appellant's claims for relief are without merit, we must, in compliance with our statutory duty under 42 Pa.C.S. § 9711(h)(3), affirm the sentence of death unless we determine that the sentence was the product of passion, prejudice or any other arbitrary factor; or the evidence fails to support the finding of at least one

aggravating factor. Upon review of the record, we conclude that the sentence of death was not the product of passion, prejudice or any other arbitrary factor. Rather, it was based upon evidence properly admitted at trial. We also conclude that the evidence was sufficient to support the finding of the aggravating factors that Appellant was paid by another person for the killing of the victim, 42 Pa.C.S. §§ 9711(d)(2); that Appellant knowingly created a grave risk of harm to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7); that Appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); and that Appellant had been convicted of another murder either before or at the time of the offense at issue, 42 Pa.C.S § 9711(d)(11).

Accordingly, we affirm the conviction of murder in the first degree and the sentence of death imposed upon the Appellant.[20]

Justice CASTILLE files a concurring and dissenting opinion joined by Justice NEWMAN.

CASTILLE, Justice, concurring and dissenting.

I join the Majority Opinion in every respect except for the majority's discussion of whether Detective McDermott breached *Miranda*[1] when he informed appellant of the evidence against him without first advising appellant of his constitutional rights. In my view, the Detective's conduct did not constitute interrogation for *Miranda* purposes and therefore no warnings were required at that point. Furthermore, I believe that the majority errs under *Miranda* and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in focusing exclusively upon the Detective's undisclosed, subjective intentions to hold that the relation of accurate factual information here amounted to an "interrogation." According-

---

**20.** The Prothonotary of the Supreme Court is directed to transmit the complete record of the case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ly, I respectfully dissent from that portion of the Majority Opinion.[2]

The majority correctly notes that interrogation under *Miranda* has been deemed to include not only "questioning initiated by law enforcement officials" but also the "functional equivalent" of express questioning:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.*

*Innis*, 446 U.S. at 301, 100 S.Ct. 1682 (footnotes omitted) (emphasis added). The majority further acknowledges, however, that there is nothing in *Innis* or its progeny to suggest that mere declaratory statements by police regarding the evidence against the suspect invariably constitute the "functional equivalent" of interrogation for *Miranda* purposes. *See Arizona v. Roberson*, 486 U.S. 675, 687, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (once suspect invokes his *Miranda* rights in investigation of one crime, police may not interrogate him regarding another; but police "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation").

An absolute rule holding that disclosure of the evidence implicating the suspect amounts to *Miranda* interrogation, of course, would be unrealistic and contrary to the policies *Miranda* was designed to promote. Information about the evidence accumulated against a suspect may contribute to a knowing and intelligent exercise of judgment regarding what course of conduct to follow, *i.e.*, whether to speak with police,

---

**2.** I agree, however, with the majority's succeeding conclusion that, even if the police did contravene *Miranda*, this violation did not invalidate appellant's subsequent valid waiver of rights and confession under *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311 (1983) and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

request an attorney, remain silent, or follow some other course. Indeed, a strong argument could be made that the police should be *encouraged* to communicate the basic evidence supporting the charges against the suspect. As the California Court of Appeals has observed:

> The entire thrust of the *Miranda* policy is to ensure that a defendant's decision to confess or not is based upon a free and intelligent appraisal of his position. This appraisal may be better made if the defendant is aware of the nature and extent of evidence or information in the possession of the police.

*People v. Sunday,* 275 Cal.App.2d 473, 480, 79 Cal.Rptr. 752 (1969). On the other hand, to hold a suspect incommunicado for a prolonged period without informing him of the basis for the charges could be seen, under certain circumstances, as more coercive than the constructive interrogation recognized by *Innis.*

Numerous Circuit Court decisions have expressly declined to extend *Miranda's* reach to declaratory statements by police officers concerning the evidence against the suspect. For example, in *Shedelbower v. Estelle,* 885 F.2d 570 (9th Cir. 1989), *cert. denied,* 498 U.S. 1092, 111 S.Ct. 975, 112 L.Ed.2d 1060 (1991), the defendant, a suspect in a recent rape and murder case, agreed to speak with the police without an attorney present. During the course of the interrogation, however, the defendant stated, "You know, I'm scared now. I think I should call an attorney," and the police promptly ended the interview. As the officers began gathering their materials in preparation to leave, one of them turned to the defendant and said that another suspect in the crimes was in custody and that the rape victim had identified the defendant's picture as one of the men who raped her and murdered her boyfriend. While it was true that the other suspect was in custody at that time, it was not true that the rape victim had seen any photographs of the defendant. In response to this information, the defendant told the police that he "had to" tell them about the crimes. He was again advised of his constitutional rights and proceeded to confess to the rape and murder.

Noting that the officer's statements after the defendant requested an attorney "did not call for nor elicit an incriminating response" and "were not the type of comments that would encourage [the defendant] to make some spontaneous incriminating remark," the Ninth Circuit held that the police comments were not the functional equivalent of *Miranda* interrogation. *Id.* at 573.

More recently, in *United States v. Moreno–Flores,* 33 F.3d 1164 (9th Cir.1994), an FBI agent informed the defendant, after he had invoked his right to remain silent, that the Government had seized approximately 600 pounds of cocaine and that the defendant was in "serious trouble." Citing, *inter alia, Shedelbower, supra,* the Ninth Circuit held that the agent's statements did not constitute interrogation under *Miranda.* Rather, the court concluded, the government agent merely "advised [the defendant] of circumstances which would contribute to an intelligent exercise of his judgment." *Moreno–Flores,* 33 F.3d at 1170 n. 5.

The Fourth Circuit has also recognized that "the *Innis* definition of interrogation is not so broad as to capture within *Miranda's* reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *United States v. Payne,* 954 F.2d 199, 202 (4th Cir.), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1680, 118 L.Ed.2d 396 (1992). In *Payne,* the defendant invoked his right to counsel following his arrest on drug charges. While he was being transported to an office of the United States Marshal Service, an FBI agent told the defendant that law enforcement had "found a gun at his home." The defendant responded, "I just had it for my protection." The defendant was ultimately charged with weapons offenses in addition to the drug charges. He argued that his statement should have been suppressed at trial on the grounds that it resulted from interrogation in violation of his *Miranda* rights and his Sixth Amendment right to counsel. The Fourth Circuit disagreed, noting that the agent's statement was not one that sought or required a response. Moreover, the court noted that the defendant was not subjected to compelling

influences, psychological ploys, or direct questioning. Accordingly, the *Payne* court concluded that the police officer's "rather innocuous statement ... did not constitute interrogation and should not result in the sanction of suppressing relevant and probative evidence." 954 F.2d at 203. This case law explicitly supports what was implicit in *Roberson*, *i.e.*, that mere statements by the police regarding the evidence against the defendant do not necessarily implicate *Miranda*.

For *Miranda* and *Innis* to have any principled application, the question of whether informing the suspect of the evidence against him constitutes interrogation under *Miranda* must depend upon the particular context in which that information is conveyed. *See Nelson v. Fulcomer*, 911 F.2d 928, 934 (3rd Cir.1990) (*Innis* inquiry is "contextual"); *United States v. Mesa*, 638 F.2d 582, 584 (3rd Cir.1980) ("[T]he determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis"). That is, in cases involving the communication of information about the strength of the case against the defendant, "it is necessary to examine the circumstances under which the information came to the defendant's attention." Wayne R. LaFave, *Criminal Procedure* § 6.7(c), at 561 (2d ed.1999).

Here, appellant notes that he arrived at the homicide unit to be formally arrested for the murders at 1:00 p.m., and was not advised of his *Miranda* rights until approximately 4:50 p.m. Appellant avers that, during this time, Detective McDermott informed him of the evidence against him "with [the] intent to get him to make a statement." Appellant's Brief at 8. Appellant then asserts in conclusory fashion that the Detective's statements regarding the case against him should have been preceded by *Miranda* warnings.

Apparently adopting appellant's simplistic reasoning, the majority concludes that appellant was "interrogated" by the disclosure of accurate factual information here and fails to discuss the circumstances of the disclosure. Instead, the majority focuses exclusively upon what it divines, from this cold record, to have been the Detective's intention. In this regard, the majority states that it has "no doubt" that Detec-

tive McDermott's words were intended to be informational only. Nevertheless, the majority concludes, this does not mean that the Detective's words and actions could not also have been reasonably likely to elicit an incriminating response from appellant and, as such, constituted the functional equivalent of express questioning for purposes of *Innis*. Although the majority purports to be focusing upon appellant's "perceptions" in this regard, its discussion is confined to Detective McDermott's testimony concerning his general approach to investigations and his subjective motivations. The majority concludes that, "when Detective McDermott explained to [a]ppellant that he had been implicated in the shootings, telling him what statements [George] Roman [an individual who sold drugs with appellant but did not participate in the killings] and [Arisbol] Ortiz [one of appellant's accomplices in the murders] had made to the police concerning his involvement, the Detective should have known that his comments and conduct were reasonably likely to evoke an effort on [a]ppellant's part to defend himself and give his own version of his involvement in the crimes at issue." Majority Op. at 404. The majority finds that the Detective "testified as much" when he stated at the suppression hearing that if appellant "want[ed] to make a statement about his action" it would be McDermott's "intention to talk to him about the case" and when he later stated at trial that "one of the reasons" he told appellant about the evidence against him was because he was "hopeful" that appellant "would give a statement admitting to what he did." [3] The majority then summarily concludes, as a matter of law, that Detective McDermott's perceived subjective intention—which was never conveyed to appellant—rendered his otherwise perfectly lawful conduct in informing appellant of the damning statements that Roman and Ortiz had made about him, the functional equivalent of a custodial interrogation, which had to be preceded by *Miranda* warnings.

3. The majority never explains how the Detective's trial testimony is pertinent to the question of this Court's review of the propriety of the prior suppression ruling. Since the majority nevertheless considers it, I will also consider it.

As a preliminary matter, it must be emphasized that appellant also testified on the question of suppression and, in point of fact, he never claimed that the Detective's summary of the evidence against him caused him to make his initial incriminating statement. Accordingly, it appears that appellant's actual perceptions were not as the majority divines them from its reading of the Detective's testimony about *his* intentions.

But even laying aside the majority's creative reading of the Detective's testimony to get at appellant's perceptions, I see no error in the trial judge's finding that there was no interrogation here. Detective McDermott's unexceptional testimony that, as a general matter, if a suspect wants to make a statement, it would be his intention to talk to the suspect, and that he was "hopeful" this appellant would confess when the facts were laid out to him, hardly made his accurate disclosure of factual information conduct that was "reasonably likely to elicit an incriminating response." Indeed, if such factual disclosures satisfy the *Innis* standard solely because of the officer's undisclosed subjective intent, as the majority holds, then it is hard to imagine any circumstance involving a disclosure of factual information that could not be labeled "interrogation." Any competent police officer who has arrested a suspect for a major crime is "hopeful" that the suspect will confess. However, "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona v. Mauro*, 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). There is nothing nefarious in an officer harboring such a hope. Nor is there anything wrong with hoping that even a bald disclosure of the factual basis for the charges will lead a particular suspect to confess his involvement. Because the majority focuses on the Detective's alleged subjective intent to the exclusion of all other factors—such as the suspect's own testimony as to his own perceptions, the duration of custody, the amount and type of interaction with police while in custody, the physical surroundings, evidence that police knew the suspect was susceptible to being influenced for some subjective reason, the nature of the suspect's response to the factual disclosures, and the suspect's familiarity with the

criminal justice system-the majority has erected a *per se* rule which renders an officer's subjective intent, even if undisclosed, the exclusive and determining factor in the *Innis* inquiry. In addition, the testimony cited by the majority simply does not amount to proof that Detective McDermott knew, or should have known, that his disclosure of accurate factual information in this case was likely to elicit an incriminating statement from this particular suspect. Detective McDermott's statements as to his subjective hope shed no light whatsoever on appellant's perception of the situation which, the majority acknowledges, is the relevant focus under *Innis*.

Considering the objective circumstances under which the evidence was communicated to appellant, I do not believe that appellant was interrogated when Detective McDermott accurately informed him that Roman and Ortiz had implicated him in the Carrisquilla and Vargas murders. First and foremost is the fact, ignored by the majority, that appellant himself initiated the disclosure of the evidence against him. At the time appellant was charged with the instant crimes, he was already in custody on unrelated charges. Appellant apparently was confused as to what he was being charged with and why, and he expressed his confusion to Detective McDermott:

Q. [Defense counsel]. What was your purpose in telling [appellant] what other people had said about him?

A. [Detective McDermott]. He asked me why he was being charged and we answered him, that we had some evidence in that we had other statements from people implicating him.

Q. He asked you why he was being charged?

A. When we told him we had arrest warrants, he was concerned over why he was being charged initially.

N.T. 8/2/99, at 70. Thus, in advising appellant that the murder charges were supported by information received from persons who had chosen to cooperate with law enforcement, the Detective did nothing more than answer appellant's questions concerning the reasons for his arrest.

I tend to agree with the numerous courts which have held that where the defendant initiates the communications, police words and actions in response are not the functional equivalent of interrogation. For example, in *United States v. Thomas,* 11 F.3d 1392 (7th Cir.1993), the Seventh Circuit held that the defendant was not interrogated where the defendant asked a police officer to let her know the results of his investigation and the officer later confronted her with evidence which contradicted her alibi. The court noted that "while there may be some question as to the propriety of allowing police officers to provide *unsolicited* information regarding the evidence they have found, this case presents a very different situation because the defendant herself" initiated the communication. *Id.* at 1397 (emphasis in original). Under these circumstances, the court held, there was no *Miranda* violation.

A number of our sister state courts have reached similar results. In *State v. Straughter,* 261 Kan. 481, 932 P.2d 387 (1997), the defendant was arrested on an outstanding juvenile warrant for auto theft. The police told the defendant that he did not have to talk to them about the auto theft or a homicide case that they were currently investigating, and the defendant asked, "What homicide?" The police explained that the defendant's fingerprints had been found on a gun used in a homicide near his home. Noting that "under *Innis,* police are not subject to a blanket prohibition from saying anything about the crime under investigation to a defendant," the Kansas Supreme Court held that the police comments in response to the defendant's question were not improper interrogation. *Id.* at 394. Similarly, in *State v. Franklin,* 299 S.C. 133, 382 S.E.2d 911 (1989), a police officer arrested the defendant in connection with a homicide investigation and told him that he wanted to advise him of his *Miranda* rights. The defendant responded, "What do I need rights for?" and the officer replied that it appeared that a man had been beaten to death. The defendant then said, "I ain't beat nobody. All I did was hold him while Rodney beat him." The court held that the officer's response to the defendant's question did not consti-

tute interrogation or its functional equivalent and refused to suppress the defendant's incriminating statement.

The District of Columbia Court of Appeals, in *Bowler v. United States,* 480 A.2d 678 (D.C.1984), likewise held that it was not interrogation under *Innis* for a police officer to reply to a murder defendant's questions concerning where he was and why he was locked up that he had shot a man on Park Street. The court concluded that the officer could not have known that his words in response to the defendant's questions were reasonably likely to elicit an incriminating reply.

In addition to the fact that the Detective's disclosures here were responsive to appellant's own inquiry, the other circumstances corroborate, in my mind, that appellant was not "interrogated" when he made the challenged admissions. Apart from the fact of custody itself, appellant was not subjected to compelling influences likely to induce him "to speak where he would not otherwise do so freely," merely because he was appraised of the evidence against him. *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602; *see Innis,* 446 U.S. at 300, 100 S.Ct. 1682 (" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). Thus, appellant was not subjected to physical violence, psychological ploys, or direct questioning-other than basic biographical queries to which *Miranda* does not apply. Nor was he denied food, water, or bathroom breaks. In fact, appellant testified that the police did not mistreat him in any way. *See* N.T. 7/30/99, at 234. The challenged statements by the Detective consisted of a few brief, intermittent, factually accurate references to the evidence against appellant over the course of several hours. Thus, appellant's incriminating statement did not follow prolonged incommunicado detention. "This is not a case where the police carried on a lengthy harangue in the presence of the suspect." *Innis,* 446 U.S. at 303, 100 S.Ct. 1682. Moreover, appellant began to confess less than four hours following his arrest for the instant murders, and he completed the statement at approximately 6:45 p.m., less than six hours after his arrest-thus conforming with this Court's prophylactic

six-hour rule. *See Commonwealth v. Washington*, 547 Pa. 550, 692 A.2d 1018, 1023 (1997) ("[A]ny statement obtained within six hours of arrest, absent coercion or other illegality, is not to be suppressed....").

Finally, I find it significant that the detective testified that, in addition to responding to appellant's own query as to why he was being charged, the disclosure of the basis for the charges here was consistent with customary arrest procedures:

Q. [Defense counsel]. Did you intend to question him about this incident when you brought him down from the prison and were processing him for the arrest?

A. [Detective McDermott]. It is the *same procedure with every defendant.* If they are willing to make a statement with regard to the incident that they are being arrested for, we are certainly willing to take it down.

Q. How do you find out if they are willing to give you a statement unless you ask them whether they want to give you a statement; how do you do that?

A. After you tell them what they are being charged with and some of the evidence and they indicate they are willing to make a formal statement, then you warn him of his rights and proceed to take the statement.

N.T. 7/30/99, at 178 (emphasis added). Under the express language of *Innis* excluding from the definition of "interrogation" words or actions "normally attendant to arrest and custody," then, this is further proof that *Miranda* should be deemed inapplicable to Detective McDermott's routine statements made incident to appellant's arrest.

In sum, I would not find interrogation to have occurred where the police, in booking a suspect, merely advised him of the charges being lodged against him and then described the evidence against him in some detail—particularly where, as here, appellant initiated the conversation by asking the police why he was being charged. In deciding whether particular police conduct is interrogation, we must remember the purpose behind the *Miranda* decision: "preventing government

officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Mauro*, 481 U.S. at 529–30, 107 S.Ct. 1931. The government actions in this case-which were pursuant to customary non-coercive arrest procedures and were intended to better inform appellant regarding the basis of the charges against him and to assist him in determining whether to cooperate with the police—do not implicate this purpose in any way. I respectfully dissent from the part of the Majority Opinion which erects a *per se* rule holding that the police violate *Miranda* whenever the disclosure of factual information is motivated, in part, by a hope, undisclosed to the suspect, that he will confess.[4]

Justice NEWMAN joins this concurring and dissenting opinion.

4. The majority notes that its conclusion is "in keeping" with this Court's pre-*Innis* holding in *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973). *Mercier*, however, is inapposite. There, the police read to the defendant a statement of another individual allegedly involved in a murder and robbery, which implicated the defendant, after he had been advised of his *Miranda* rights and had invoked his right to counsel. *Sub judice*, appellant never invoked his *Miranda* rights. In addition, unlike here, there is nothing in the *Mercier* decision to suggest that the defendant initiated a discussion of the nature of the charges against him and the evidence supporting the allegations.