J-S05030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL TYRONE WALKER, | |
| Appellant | No. 933 MDA 2015 |

Appeal from the Judgment of Sentence May 29, 2015
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0001328-2012

BEFORE:  BENDER, P.J.E., SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 18, 2016**

Appellant, Michael Tyrone Walker, appeals from the judgment of sentence entered following his convictions of one count each of murder of the first degree, murder of the second degree, murder of the third degree, robbery, burglary, criminal trespass, theft, receiving stolen property, possessing instruments of crime, and eight counts of conspiracy.  We affirm.

The trial court summarized the factual history of this case as follows:

> On December 19, 2011, Pennsylvania State Police (PSP) Trooper Michael Koslosky was dispatched to 720 Chestnut Street, in Shoemakersville, Berks County, in response to a suspected residential burglary.  When Trooper Koslosky arrived at the residence, he was met by the homeowner, Brian Trump.  Mr. Trump told the officer that when he arrived home from work that afternoon around 4:00 p.m., his home was in disarray.  Mr.

_____

[*]  Retired Senior Judge assigned to the Superior Court.

Trump estimated that he was missing approximately $8,000.00 in cash and two handguns. Other suspicious items were found inside the home, including discarded vinyl gloves, a prybar, and blood spatter in the hallway and bedroom.

Mr. Trump explained to Trooper Koslosky that his house guest, Stephen Leibensperger, had not been located. Mr. Leibensperger had recently relocated and was staying with Mr. Trump. Trooper Matthew Brady, a criminal investigator with the PSP Hamburg barracks, arrived to provide assistance with Trooper Koslosky's initial investigation. The officers decided to canvas the neighborhood. Troopers Brady and Koslosky conducted a more thorough search of the residence. Trooper Brady then located a large pool of blood in the bedroom. Resting in the pool of blood was a black plastic handle from a kitchen knife. Subsequently, Troopers Brady and Koslosky located the body of Stephen Leibensperger wrapped in sheets and bedding in the attic of Mr. Trump's residence. Trooper Brady officially declared the residence a crime scene.

Information from neighbors led investigators to the retrieval of videotape footage from a Berks Area Reading Transportation Authority (BARTA) bus depicting three black males, all dressed in black clothing. These individuals were identified as Appellant, Mark Ellis, Sr., and Brian Simpkins. Cameras located on the bus traveling from Reading to Shoemakersville, captured images of the suspects during a mid-morning route on December 19, 2011. Additionally, police obtained surveillance footage from a Sheetz gas station on Shoemakersville Avenue depicting the same three individuals exiting the bus at approximately 10:30 a.m. and walking on Noble Avenue toward Chestnut Street.

Brian Trump was interviewed by Trooper Brady and immediately identified Appellant to police as a person of interest. Earlier in the day on December 19, Mr. Leibensperger called Mr. Trump at work to inform him that Appellant had been calling the house all morning. Trump informed Trooper Brady that Appellant had been an intimate friend of his and was upset when Mr. Leibensperger moved in with Mr. Trump a few weeks before the incident. Police showed Mr. Trump images obtained from the BARTA and Sheetz videotapes and he identified Appellant as one of the men in the images.

Appellant was arrested at a Rodeway Inn between the hours of midnight and 2:00 a.m. of December 20, 2011. At the time of Appellant's arrest, police seized a black hooded sweatshirt, a New York Yankees baseball hat similar to one depicted in the surveillance video, $1,077 in cash and a pair of white long johns that appeared to be stained with blood. Glassine packets with white residue, a glass smoking pipe, and a copper-colored screen were also found by police in the hotel room where Appellant was staying.

After the arrest, Appellant was transported to the police barracks in Hamburg, Pennsylvania. Appellant was placed in an interview room with Trooper Wegscheider and Trooper Brady. During the interview, Appellant stated that on December 19, 2011, Appellant, his father Mark Ellis, and step-brother Brandon Simpkins took the [BARTA] bus from Reading to Shoemakersville and then walked to Mr. Trump's residence. Appellant stated that the three individuals entered the residence and Appellant then confronted Mr. Leibensperger with a knife. Appellant admitted to stabbing the victim several times causing the death of Mr. Leibensperger. Appellant, Mr. Ellis, and Mr. Simpkins then searched the residence and removed cash and two handguns from the residence. During the interview, Appellant expressed that it was his intention to kill Mr. Leibensperger and Mr. Trump. Appellant explained that after the incident, the men left the residence to take the [BARTA] bus back to Reading.

On December 20, 2011, Appellant received a screening and health assessment at Berks County Jail. Appellant received detoxification treatment for alcohol at the Berks County Jail until December 25, 2011.

On December 21, 2011, around 3:00 in the afternoon, Trooper Brady and Trooper Wegscheider visited Appellant in Berks County Prison. Trooper Brady provided Appellant with the standard *Miranda*[1] waiver form which Appellant acknowledged and signed. Trooper Brady asked Appellant several questions in order to clarify issues relating to Appellant's accomplices and the knife found at the crime scene. The Troopers['] follow-up

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

interview at Berks County Prison with Appellant lasted around twenty (20) minutes.

Trial Court Opinion, 7/14/15, at 4-6.

The trial court explained the procedural history as follows:

Appellant was charged with Murder of the First Degree, Murder of the Second Degree, Murder of the Third Degree, Robbery, Burglary, Criminal Trespass, Theft By Unlawful Taking or Disposition, Receiving Stolen Property, Possession of Instruments of Crime, Conspiracy to Commit Murder of the First Degree, Conspiracy to Commit Murder of the Second Degree, Conspiracy to Commit Murder of the Third Degree, Conspiracy to Commit Robbery, Conspiracy to Commit Burglary, Conspiracy to Commit Criminal Trespass, Conspiracy to Commit Theft By Unlawful Taking or Disposition, and Conspiracy to Commit Receiving Stolen Property.

On or about March 19, 2013, the Appellant filed an Omnibus Pretrial Motion, which the court scheduled for May 9, 2013. On or about May 9, 2013, the Appellant withdrew his Omnibus Pretrial [M]otion. On or about May 13, 2013, this Court entered an order directing Dr. Rotenberg to conduct a follow-up reevaluation of the Appellant's mental health status upon his return to the Berks County Jail System from the Norristown State Hospital. On September 10, 2013, [the] Commonwealth filed a "Motion to Compel the Defense to Provide the Commonwealth with Copies of Any Data or Result Produced from Psychological Testing Conducted on the Defendant by their Mental Health Expert Pursuant to Pa.R.Crim.P. 573 (C)(1)(A).["] On or about October 2, 2013, this Court entered an order directing Dr. Rotenberg to re-evaluate Appellant with regard to the issues of competency, insanity, guilty but mentally ill, and capacity to form specific intent for the crimes charged. Dr. Rotenberg was ordered to submit a report to defense counsel only. On November 18, 2013, a case status was scheduled for January 10, 2014 with Rule 600 being waived by [Appellant]. On January 10, 2014, an Omnibus Pretrial Motion Hearing was scheduled for March 4, 2014.

Pretrial Hearings were held on March 4, 2014 and March 14, 2014. At the end of the March 14, 2014 hearing, Defense Counsel, Elizabeth M. Ebner, Esquire, requested a continuance to

discuss with Appellant the possibility of Appellant taking the stand at the pretrial hearing. On May 2, 2014, Defense Counsel requested a mental health evaluation for Appellant by Dr. Rotenberg and requested a continuance of the pretrial hearing. On July 3, 2014, Defense Counsel filed a Motion to Withdraw as Court Appointed Counsel. On July 21, 2014, Attorney Ebner's Motion to Withdraw was granted by this Court. On July 21, 2014, this Court appointed Jay Nigrini, Esquire as Counsel for Defendant. On October 22, 2014, a final Omnibus Pretrial hearing was held. On December 10, 2014, this Court filed an order and opinion dismissing Appellant's Omnibus Pretrial Motion.

A jury trial was held from April 20, 2015 through April 23, 2015. On April 23, 2015, Appellant was found guilty of: Count 1 - Murder of the First Degree; Count 2 - Murder of the Second Degree; Count 3 - Murder of the Third Degree; Count 4 - Robbery; Count 5 - Burglary; Count 6 - Criminal Trespass; Count 8 - Theft by Unlawful Taking or Disposition; Count 9 - Receiving Stolen Property; Count 10 - Possessing Instruments of Crime; Count 11 - Conspiracy to Commit Murder of the First Degree; Count 12 - Conspiracy to Commit Murder of the Second Degree; Count 13 - Conspiracy to Commit Murder of the Third Degree; Count 14 – Conspiracy to Commit Robbery; Count 15 - Conspiracy to Commit Burglary; Count 16 - Conspiracy to Commit Criminal Trespass; Count 18 - Conspiracy to Commit Theft by Unlawful Taking or Disposition; and Count 18 - Conspiracy to Commit Receiving Stolen Property.

On May 29, 2015, Appellant was sentenced on Count 1, Murder of the First Degree, to the Bureau of Corrections for confinement in a State Correctional Facility for life. On Count 4, Robbery, Appellant was sentenced to not less than 5.5 years nor more than 20 years of incarceration to commence at the expiration of the sentence imposed at Count 1. On Count 5, Burglary, Appellant was sentenced to not less than 2.5 years nor more than 20 years of incarceration to commence at the expiration of the sentence imposed at Count 1 and to run concurrent with Count 4. On Count 10, Possessing Instruments of Crime, Appellant was sentenced to not less than 1 year nor more than 5 years of incarceration to commence at the expiration of the sentence imposed at Count 1 and to run concurrent with Counts 4 and 5. On Count 11, Conspiracy to Commit Murder of the First Degree, Appellant was sentenced to

- 5 -

not less than 20 years nor more than 40 years of incarceration to commence at the expiration of the sentence imposed at Count 1 and to run concurrent with Counts 4, 5, and 10.

Trial Court Opinion, 7/14/15, at 1-3. This timely appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

1. Whether the trial court erred in denying Appellant's motion to suppress the Appellant's written and spoken confessions as the Appellant was under the influence of cocaine at the time <u>Miranda</u> was provided which rendered the Appellant unable to knowingly and voluntarily waive his right to remain silent?

Appellant's Brief at 4.

In his sole issue, Appellant argues that the trial court erred in failing to grant the motion to suppress his oral and written confessions after he was arrested. Appellant's Brief at 9-10. Appellant asserts that the confessions should have been suppressed because he was under the influence of controlled substances and therefore did not knowingly and voluntarily waive his right to remain silent.

With respect to an appeal from the denial of a motion to suppress, our Supreme Court has stated the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Eichinger*, 915 A.2d 1122, 1134 (Pa. 2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).[2]

Further, we are aware that Pa.R.Crim.P. 581, which addresses the suppression of evidence, provides in relevant part as follows:

> (H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).

---

[2] On October 30, 2013, our Supreme Court decided *In re L.J.*, in which the Court held that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *L.J.*, 79 A.3d at 1087. Prior to *L.J.*, this Court routinely held that, when reviewing a suppression court's ruling, our scope of review included "the evidence presented both at the suppression hearing and at trial." *Commonwealth v. Charleston*, 16 A.3d 505, 516 (Pa. Super. 2011) (quoting *Commonwealth v. Chacko*, 459 A.2d 311 (Pa. 1983)). *L.J.* thus narrowed our scope of review of suppression court rulings to the evidence presented at the suppression hearing. In this case, Appellant's suppression hearings were held after *L.J.* was decided. Therefore, we will apply the rule announced in *L.J.* to the case at bar. *See L.J.*, 79 A.3d at 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision").

In **Miranda**, the Supreme Court set forth safeguards to protect a person's rights under the Fifth Amendment to the United States Constitution which provides that a criminal defendant cannot be compelled to be a witness or give evidence against himself. **Miranda**, 384 U.S. at 461. The Court held police officers are required to inform a suspect prior to questioning that he has the right to remain silent, that any statement made may be used against him, and that he has the right to an attorney. **Miranda**, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." **Id**. The Pennsylvania Supreme Court has reiterated that for a waiver of these rights to be valid, the defendant must be adequately apprised of and understand his rights and the consequences of waiving those rights, and must not be threatened, forced, or coerced to waive his rights in any way. **Commonwealth v. DeJesus**, 787 A.2d 394, 402 (Pa. 2001). "It is the Commonwealth's burden to establish whether [the accused] knowingly and voluntarily waived his **Miranda** rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." **Eichinger**, 915 A.2d at 1135-1136.

In considering whether a defendant has validly waived his **Miranda** rights, the trial court engages in a two-pronged analysis:

> (1) whether the waiver was voluntary, in the sense that [the] defendant's choice was not the end result of governmental

- 8 -

pressure[;] and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

***Commonwealth v. Mitchell***, 902 A.2d 430, 451 (Pa. 2006).

We stated the specific law in Pennsylvania pertaining to the waiver of

***Miranda*** warnings while intoxicated as follows:

> The fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded to it.
>
> ***Commonwealth v. Adams***, 385 Pa. Super. 513, 561 A.2d 793, 795 (Pa. Super. 1989) (citation omitted). "[W]hen evidence of impairment is present, it is for the suppression court to decide whether the Commonwealth has established by a preponderance of the evidence that the suspect nonetheless had sufficient cognitive awareness to understand the ***Miranda*** warnings and to choose to waive his rights." ***Commonwealth v. Britcher***, 386 Pa. Super. 515, 563 A.2d 502, 507 (Pa. Super. 1989) (citations omitted).

***Commonwealth v. Ventura***, 975 A.2d 1128, 1137-1138 (Pa. Super. 2009) (footnote omitted).

After a thorough review of the certified record, the briefs of the parties, the applicable law, and the suppression court's findings of fact and conclusions of law, we conclude Appellant's issue merits no relief. It is our conclusion that the record demonstrates the suppression court did not err in determining Appellant knowingly, intelligently, and voluntarily waived his

*Miranda* rights and that the suppression court's opinion properly disposes of the issue presented. Suppression Court Findings of Fact and Conclusions of Law in Disposition of [Appellant's] Omnibus Pretrial Motion, filed 12/10/14, at 3-16. Indeed, the record establishes that Appellant "had sufficient mental capacity at the time of giving his statement to know what he was saying." *Ventura*, 975 A.2d 1128, 1137-1138 (citing *Adams*, 561 A.2d at 795). We will not disturb the suppression court's credibility determinations. Thus, Appellant's claim that he was too impaired to waive his *Miranda* rights fails. Accordingly, we adopt the trial court's reasoning as our own, and affirm on the basis of its opinion with regard to Appellant's issue.[3]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2016

---

[3] The parties are directed to attach a copy of the trial court's opinion filed December 10, 2014, in the event of further proceedings in this matter.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF BERKS COUNTY, PENNSYLVANIA
:
vs. : CRIMINAL DIVISION
:
MICHAEL T. WALKER, : No.    CP 06 CR 1328-2012
Defendant : JUDGE THOMAS G. PARISI

## ORDER OF COURT

AND NOW, this 9th day of December, 2014, it is **ORDERED** that the Defendant's

Omnibus Pretrial Motion is hereby **DENIED.**

BY THE COURT:

_____
THOMAS G. PARISI,                              J.

Distribution:

| | |
|---|---|
| Clerk of Courts | Original |
| Computer | X |
| Defendant | X |
| Defense Attorney | Nigrini |
| District Attorney | Glessner |
| Adult Probation | X |
| Judge | X |

COMMONWEALTH OF PENNSYLVANIA  :  IN THE COURT OF COMMON PLEAS
:  OF BERKS COUNTY, PENNSYLVANIA
vs.  :  CRIMINAL DIVISION
:
MICHAEL T. WALKER  :  No.    CP 06 CR 1328-2012
Defendant  :  JUDGE THOMAS G. PARISI

Jay Nigrini, Attorney for Defendant

Jason Glessner, Attorney for the Commonwealth

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN DISPOSITION OF DEFENDANT'S OMNIBUS PRETRIAL MOTION

Defendant is charged with Murder of the First Degree, Murder of the Second Degree, Murder of the Third Degree, Robbery, Burglary, Criminal Trespass, Theft By Unlawful Taking or Disposition, Receiving Stolen Property, Possession of Instruments of Crime, Conspiracy to Commit Murder of the First Degree, Conspiracy to Commit Murder of the Second Degree, Conspiracy to Commit Murder of the Third Degree, Conspiracy to Commit Robbery, Conspiracy to Commit Burglary, Conspiracy to Commit Criminal Trespass, Conspiracy to Commit Theft By Unlawful Taking or Disposition, and Conspiracy to Commit Receiving Stolen Property.

Defendant filed an Omnibus Pretrial Motion on March 27, 2013. Omnibus Pretrial Hearings were held on March 4, 2014 and March 14, 2014. At the end of the March 14, 2014 hearing, Defense Counsel, Elizabeth M. Ebner, Esquire, requested a continuance to discuss with Defendant the possibility of Defendant taking the stand at the pretrial hearing. On May 2, 2014, Defense Counsel requested a mental health evaluation for Defendant and requested a continuance of the pretrial hearing. On July 3, 2014, Defense Counsel filed a Motion to Withdraw as Court Appointed Counsel. On July 21, 2014, Attorney Ebner's Motion to Withdraw was granted by this Court. On July 21, 2014, this Court appointed Jay Nigrini, Esquire as Counsel for Defendant. On October 22, 2013, a final Omnibus Pretrial hearing was held.

CLERK OF COURTS

2

For the reasons set forth below, Defendant's Motion for Suppression of Statements is denied.

## FACTUAL FINDINGS

On December 19, 2011, Pennsylvania State Police (PSP) Trooper Michael Koslosky was dispatched to 720 Chestnut Street, in Shoemakersville, Berks County, in response to a suspected residential burglary. When Trooper Koslosky arrived at the residence, he was met by the homeowner, Brian Trump. Mr. Trump told the officer that when he arrived home from work that afternoon around 4:00 p.m., his home was in disarray. Mr. Trump estimated that he was missing approximately $8,000.00 in cash and two handguns. Other suspicious items were found inside the home, including discarded vinyl gloves, a prybar, and blood spatter in the hallway and bedroom.

Mr. Trump explained to Trooper Koslosky that his house guest, Stephen Leibensperger, had not been located. Mr. Leibensperger had recently relocated and was staying with Mr. Trump. Trooper Matthew Brady, a criminal investigator with the PSP Hamburg barracks, arrived to provide assistance with Trooper Koslosky's initial investigation. The officers decided to canvas the neighborhood. Troopers Brady and Koslosky conducted a more thorough search of the residence. Trooper Brady then located a large blood pool in the bedroom. Resting in the pool of blood was a black plastic handle from a kitchen knife. Subsequently, Troopers Brady and Koslosky located the body of Stephen Leibensperger wrapped in sheets and bedding in the attic of Mr. Trump's residenceTrooper Brady officially declared the residence a crime scene.

Information from neighbors led investigators to the retrieval of videotape footage from a Berks Area Reading Transportation Authority (BARTA) bus depicting the three black males, dressed in all black clothing. These individuals were identified as Defendant, Mark Ellis, Sr.,

3

and Brian Simpkins. Cameras located on the bus traveling from Reading to Shoemakersville, captured images of the suspects during a mid-morning route on December 19, 2011. Additionally, police obtained surveillance footage from the Sheetz gas station on Shoemakersville Avenue depicting the same three individuals exiting the bus at approximately 10:30 am on December 19, 2011 and walking on Noble Avenue toward Chestnut Street.

Brian Trump was interviewed by Trooper Brady and immediately identified Defendant to police as a person of interest. Earlier in the day on December 19, Mr. Leibensperger called Mr. Trump at work to inform him that Defendant had been calling the house all morning. Trump informed Trooper Brady that Defendant had been an intimate friend of his and was upset when Mr. Leibensperger moved in with Mr. Trump a few weeks before. Police showed Mr. Trump the images obtained from the BARTA and Sheetz videotapes and he identified Defendant as one of the men in the images.

Defendant was arrested at a Rodeway Inn between the hours of midnight and 2:00 a.m. of December 20, 2011. At the time of Defendant's arrest, police seized a black hooded sweatshirt, a New York Yankees baseball hat similar to the one depicted in the surveillance video, $1,077 in cash and a pair of white long johns that appeared to be stained with blood. Glassine packets with white residue, a glass smoking pipe, and a copper-colored screen were also found by police in the hotel room where Defendant was staying.

After the arrest, Defendant was transported to the police barracks in Hamburg, Pennsylvania. Defendant was placed in an interview room with Trooper Wegscheider and Trooper Brady. During the interview, Defendant stated that on December 19, 2011, Defendant, his father Mark Ellis, and step-brother Brandon Simpkins took the Barta Bus from Reading to Shoemakersville and then walked to Mr. Trump's residence. Defendant stated that the three

4

individuals entered the residence and Defendant then confronted Mr. Leibensperger with a knife. Defendant admitted to stabbing the victim several times causing the death of Mr. Leibensperger. Defendant, Mr. Ellis, and Mr. Simpkins then searched the residence and removed cash and two handguns from the residence. During the interview, Defendant expressed that it was his intention to kill Mr. Leibensperger and Mr. Brian Trump. Defendant explained that after the incident, the men left the residence to take the Barta Bus back to Reading.

On December 20, 2011, Defendant received a screening and health assessment at Berks County Jail. Defendant received detoxification treatment for alcohol at the Berks County Jail up until December 25, 2011.

On December 21, 2011, around 3:00 in the afternoon, Trooper Brady and Trooper Wegscheider visited Defendant in Berks County Prison. Trooper Brady provided Defendant with the standard *Miranda* waiver form which Defendant acknowledged and signed. Trooper Brady asked Defendant several questions in order to clarify issues relating to Defendant's accomplices and the knife found at the crime scene. The Troopers follow-up interview at Berks County Prison with Defendant lasted around twenty (20) minutes.

## DISCUSSION

Defendant claims that his out-of-court statements should be suppressed because he lacked sufficient cognitive awareness to understand : (1) the *Miranda* warnings given to him by Trooper Brady and (2) the choice to waive his rights under *Miranda*. Defendant believes he lacked the sufficient mental capacity to provide a statement to police and that he did not voluntary intend to provide such statements to police. Defendant argues the fact that he was found with drugs and paraphernalia shortly before his arrest. As a result, he was under the influence of drugs during his interview with police thus making his waiver of *Miranda* rights involuntary.

5

In *Commonwealth v. Smith*, 291 A.2d 103, 104 (Pa. 1972), the Pennsylvania Supreme Court established the following standard when determining an accused's sufficient mental capacity at the time of confession:

> The fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements. The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it. Recent imbibing or the existence of a hangover does not make his confession inadmissible, but goes only to the weight to be accorded to it.

*Id.* at 104.

"[W]hen evidence of impairment is present, it is for the suppression court to decide whether the Commonwealth has established by a preponderance of the evidence that the suspect nonetheless had sufficient cognitive awareness to understand the *Miranda* warnings and to choose to waive his rights." *Commonwealth v. Ventura*, 975 A.2d 1128, 1137-1138 (Pa. Super. 2009) quoting *Commonwealth v. Britcher*, 563 A.2d 502, 507 (Pa. 1989).

In *Smith*, the evidence presented at Smith's suppression hearing conflicted. *Id.* The two detectives who interviewed Smith both testified to the fact that he "appeared to have been drinking and was nervous and shaky." *Id.* However, they both confirmed Smith "was alert and responsive, and at no time failed to understand the nature of the interrogation or the questions asked of him." *Id.* Defense counsel called defendant's wife, who testified that Smith was drinking heavily the night and morning prior to his confession. *Id.* at 104. Additionally, Smith testified that he had several drinks prior to his apprehension by police and that he passed out at the police station with no memory of the events that transpired thereafter. *Id.* The Pennsylvania Superior Court affirmed the trial court's determination that the detectives' testimony as to the defendant's condition and capacity was credible, thereby rejecting the testimony of defendant and his wife.

6

In *Commonwealth v. Streeter*, "Streeter testified at the suppression hearing that during the twelve to fifteen hours that preceeded his arrest, he had taken four to five Xanax tablets, four to five Ecstasy tablets, and had smoked an ounce and one-half of marijuana." *Commonwealth v. Streeter*, 2011 Pa. Dist. & Cnty. Dec. LEXIS 115, 2 (Pa. County Ct. 2011). However, the interviewing officer "testified that Streeter did not appear to be under the influence of drugs or alcohol and that he freely and voluntarily waived his rights and confessed to the commission of the crimes." *Id.* at 3. The court held "his use of the substances was not to such an extent that he was impaired so as to prevent him from freely and voluntarily waiving his *Miranda* rights." *Id.* at 7-8. Finding, "the fact that an accused has been drinking does not automatically invalidate his subsequent incriminating statements." *Id.*

As the fact-finder with respect to Defendant's motion, this Court is required to analyze the testimony and use common sense and experience in making a determination as to credibility

After Defendant's arrest, Trooper Michael Wegscheider placed Defendant in custody, walked him to the police car, and transported him to the Hamburg police barracks. Trooper Wegscheider was asked at the suppression hearing if he noticed any signs from Defendant that he was under the influence of alcohol and/or drugs at this time. Notes of Testimony [hereinafter N.T.], 3/4/14, at 7-8. Trooper Wegscheider stated, "I would say not at all with alcohol to my recollection. And as far as illegal drugs, nothing specific that jumps out that would indicate he was, you know, manifestly under the influence of any kind of substance in general, no." N.T., 3/4/14, at 8.

Trooper Wegscheider testified that he was in the interview room with Trooper Brady when Trooper Brady read Defendant his *Miranda* warnings from a standard state police form, verbatim. N.T. 3/4/14, at 9. The standard *Miranda* form was then signed by both Trooper Brady

7

and Defendant after Trooper Brady further explained the warnings to Defendant. *Id.*; *see* Commonwealth's Exhibit No. 1. Trooper Wegsheider testified that the first oral interview with Defendant lasted about one hour. *Id.* at 18.

> TROOPER WEGSHEIDER: The first *Miranda* Warnings were provided at approximately 0255 hours. The next set of *Miranda* warnings were presented at approximately 0358 hours. So that's from warning to warning, that is about an hour. So the interview was probably around 50 minutes, 55 minutes." *Id.* Trooper Wegscheider testified that the first part of the oral interview with Defendant lasted about fifty (50) to fifty-five (55) minutes.

N.T., 3/4/14, at 18.

The next set of *Miranda* warnings, presented to Defendant at approximately 0358 hours, were also read verbatim from the standard state police custodial written statement form which Defendant then signed and acknowledged. *Id.* at 11-12; N.T., 3/4/14, at 20; *see Commonwealth's Exhibit No. 3.*

Trooper Brady testified that during the oral interview, he interviewed Defendant while Trooper Wegscheider took notes. N.T., 3/14/14, at 24. Around 0358, Trooper Brady requested that Defendant write a written statement of what happened at Mr. Trump's residence. *Id.*; Commonwealth's Exhibit No. 2. Trooper Brady testified that he then read Defendant his *Miranda* rights off a custodial written statement form. At 0403, Trooper Brady asked Defendant to write a statement of what happened. Commonwealth's Exhibit No. 2. Defendant prepared a five page written statement, followed by his initials. N.T., 3/4/14, at 20. The written statement was completed by Defendant on December 20, 2011 and timed at 0523 hours.

Trooper Wegscheider testified to the following concerning Defendant's demeanor while Defendant drafted the written statement:

8

| A.D.A. GLESSNER: | Did Mr. Walker – did you or Trooper Brady ever question him about, you know, his story and whether or not it was truthful? |
|---|---|
| TROOPER WEGSCHEIDER: | Yes. We questioned him and his answer – his answers in general seem to be lucid. He seemed to be coherent during the interview. His answers during the interview changed. So in general, there were some inconsistent answers, but I believe that what [sic] was due to some deceptiveness early in the interview and more credible answers toward the end of the interview. |

N.T., 3/4/14, at 14.

Trooper Brady was also asked at the pretrial hearing about Defendant's demeanor during the interview on December 20, 2011:

| A.D.A GLESSNER: | At some point, based on your training and experience, did you notice anything about Mr. Walker that indicated to you that he was under the influence of controlled substances or alcohol? |
|---|---|
| TROOPER BRADY: | No. His appearance and the way he acted was consistent with people that I have interviewed in the past involved in a homicide. He was a little nervous and scared. |

N.T., 3/14/14, at 23.

. . . .

| A.D.A. GLESSNER: | Okay. And in talking to him for over a course of an hour roughly, did you notice anything about his mannerisms or his appearance that would make you think he was under the influence of any controlled substances or alcohol? |
|---|---|
| TROOPER BRADY: | No. |
| A.D.A. GLESSNER: | Well specifically, did you smell any alcohol? |
| TROOPER BRADY: | No. |

9

| A.D.A. GLESSNER: | And you said, I believe that he was somebody that he [sic] appeared typical. I think you said that. What do you mean typical? |
| --- | --- |
| TROOPER BRADY:1 | Consistent with someone who is being interviewed in regards to a homicide. They are nervous and a lot of times scared of what is going on being in a police station for an interview. |

N.T., 3/14/14, at 25-26.

. . . .

| TROOPER BRADY: | The method in which the interview was conducted and the way he initially denied, eventually did admit to being involved, but limited his involvement to then later admitting full involvement is consistent with many people that I interviewed in the past that was guilty of what they committed. |
| --- | --- |

N.T., 3/14/14, at 27-28.

Mr. David Dupree, the forensics unit supervisor, testified to Defendant's demeanor at the time of Defendant's fingerprinting and photographing following his arrest in the early morning of December 20, 2011. The Court asked the witness the following:

| THE COURT: | When you were talking to him trying to get biographical information, were there any indications that would indicate to you that he was sleepy in any way? |
| --- | --- |
| MR. DUPREE: | No, just the opposite. He was pretty much nonstop talking. He did not appear sleepy at all. |

N.T., 3/4/14, at 83-84.

Additionally, Defense counsel called Lynn Leppo, head of medical records with the Berks County Jail System. Mr. Leppo testified to the medical records from the date Mr. Walker arrived at the prison until he was released from detox treatment. Mr. Leppo stated that when a resident comes into their facility, the resident is first seen by a medical assistant (MA) and receives a

10

medical screening. N.T., 3/14/14, at 6. Once the screening is finished and the proper forms are completed, the MA will make a decision on the welfare of the patient and recommend to the licensed nurse future treatment for the resident. *Id.* The Commonwealth asked the following questions pertaining to Defendant's screening and daily detox checks with the MA and licensed nurse:

| A.D.A. GLESSNER: | December 21 of 2011 talks about daily detox check. It just says alcohol, correct? |
| --- | --- |
| MR. LEPPO: | Yes, it does. |
| A.D.A. GLESSNER: | And that says refused appointment? |
| MR. LEPPO: | That's correct. |
| A.D.A. GLESSNER: | And I don't know if that has a specific time on it. Do you have that there, 14:50 hours maybe? |
| MR. LEPPO: | Yes, 14:05. |
| A.D.A. GLESSNER: | Okay. And just to go back, if the MA or the nurse would have seen something abnormal about Mr. Walker's appearance, they would have written that down here? |
| MR. LEPPO: | Correct. |

N.T., 3/14/14, at 14-15.

On October 22, 2014, Defense Counsel called co-defendant Brandon Simpkins to testify to his observations of Defendant not only prior to the incident, but after the incident as well. Defense Counsel asked Mr. Simpkins the following questions relating to Defendant's behavior:

| MR. NIGRINI: | In the time that you had known Mr. Walker prior to December 19, 2011, had you ever seen him under the influence of drugs? |
| --- | --- |
| MR. SIMPKINS: | No. |

11

MR. NIGRINI:          Had you ever seen him under the influence of alcohol?

MR. SIMPKINS:          Yes.

MR. NIGRINI:          And to your knowledge, prior to December 19, 2011, did you know whether or not Mr. Walker took prescription medication?

MR. SIMPKINS:          No.

N.T., 10/22/14, at 6-7.

. . . .

MR. NIGRINI:          And did you take a bus to the location where Michael indicated where you could get some money?

MR. SIMPKINS:          Yes.

MR. NIGRINI:          In those 45 minutes, before you got on the bus, did you observe Mr. Walker ingesting or using any drugs, controlled substances?

MR. SIMPKINS:          No.

MR. NIGRINI:          Did you observe your father take any drugs or controlled substances?

MR. SIMPKINS:          No.

MR. NIGRINI:          In the 45 minutes before you got on the bus, did Mr. Walker remain, in your words, antsy?

MR. SIMPKINS:          Yeah.

MR. NIGRINI:          And what do you mean by antsy? What did you observe of his behavior that gave you the belief that he was antsy?

MR. SIMPKINS:          Not able to sit still, pacing, that is about it.

. . . .

12

MR. NIGRINI:                    At any point while the three of you were on the bus, did you observe Mr. Walker ingesting any controlled substances?

MR. SIMPKINS:                  No.

N.T., 10/22/14, at 8-9.

. . . .

MR. NIGRINI:                    From the time that you guys left the house until you got onto the bus from this area back to Reading, did you observe Mr. Walker ingest any drugs or controlled substances?

MR. SIMPKINS:                  No.

MR. NIGRINI:                    During the bus ride from this location back to Reading, did you observe Mr. Walker ingest any drugs or controlled substances?

MR. SIMPKINS:                  No.

MR. NIGRINI:                    How would you describe Mr. Walker's demeanor while on the bus back to Reading?

MR. SIMPKINS:                  He was regular.

MR. NIGRINI:                    Did he appear to be antsy any longer?

MR. SIMPKINS:                  A little bit.

. . . .

MR. NIGRINI:                    So the three of you went back to your father's house. From the time that you were dropped off from the bus in Reading until you got to your father's house did you observe Mr. Walker ingest any drugs or controlled substances?

MR. SIMPKINS:                  No.

N.T., 10/22/14, at 11-12

13

MR. NIGRINI:                    At any point until Mr. Walker left your father's house after he left these jeans and shirt behind, did you ever see Mr. Walker in possession of any drugs or controlled substances on this day?

MR. SIMPKINS:                   No.

N.T., 10/22/14, at 13.

Defense Counsel also called Defendant to testify to his behavior on December 19th and 20th of 2011. Defendant went on to explain that back in December of 2011, he had been taking prescribed medication for bipolar disorder, paranoid schizophrenia, and psychotic mood swings. N.T., 10/22/14, at 16. Defendant explained how he had to continuously check himself in at the hospital to get prescriptions because any money he received he would spend on crack cocaine. *Id.* at 17. In 2011, Defendant said he was specifically prescribed Ritalin, Klonopin, Depakote, and Zoloft. *Id.* When Defendant was asked how many pills he took on the morning of December 19, 2011, Defendant stated, "All I just remember is that I just – I popped 20 [pills]. I crushed it up, and sniffed it into my nose." *Id.* Defendant went on to explain that he then went to co-defendant Mark Ellis's house and began banging on the door. *Id.* at 18. Defendant testified that co-defendant Ellis gave him $70 worth of crack cocaine to calm him down and he smoked the entire amount at the house. *Id.* Defendant said that after smoking the crack cocaine, he just "zoned out." *Id.* at 19. Defendant explained that when he smokes crack cocaine on top of taking his prescription medication, he zones out to the point where he looks like a zombie. *Id.* From there, Defendant testified that he does not remember anything after that point.

Defendant believes his out of court statements provided on December 20, 2011 should be suppressed as his statement was incoherent and under the influence of drugs to the point that his mental capacity rendered his waiver of *Miranda* involuntary.

14

The test for determining voluntariness is whether Defendant had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it.' *Commonwealth v. Smith*, 291 A.2d 103, 104 (1972). *See also Commonwealth v. Davenport*, 295 A.2d 596 (1972). "As with the consumption of alcohol, drug intake does not automatically invalidate an incriminatory statement." *Commonwealth v. Cornish*, 370 A.2d 291, 297 (Pa. 1977). The officers' testimony at the pretrial hearing clearly establishes that Defendant's will was not impaired by alleged drug or alcohol intake at the time of questioning. The record further shows Defendant was alert and responsive at the time of the interview. Looking at the testimony provided at the pretrial hearings, there was no sign that Defendant suffered from any kind of physical discomfort at the time of the interview with the officers. After explaining the waiver of *Miranda* to Defendant, Defendant did not make any objection nor did he notify the officers that he failed to understand the nature of the interrogation.

Defendant offered the testimony of co-defendant Simpkins at the pretrial hearing. Mr. Simpkins testified consistently that he did not observe the Defendant ingesting any drugs and/or alcohol prior to or after the death of Mr. Leibensperger. Furthermore, Lynn Leppo and David Dupree testified to Defendant's demeanor on the day of his arrest and the days following. Mr. Leppo stated that the license nurse and medical assistant that medically treated Defendant after his arrest made no notation of his supposed intoxication. Mr. Dupree stated that Defendant was alert and talkative at the time his fingerprints were taken, but saw no sign of drowsiness on behalf of the Defendant. Defendant testified that he had no recollection of any of the events at the time of his arrest or the events leading up to his arrest due to his mental disorders and abuse of pills and crack cocaine on the day of the alleged killing.

15

After review of the record, this court finds credible the officers' testimony as to Defendant's condition and capacity at the time of giving his statement and not that of Defendant. Trooper Brady also confirmed at the pretrial that Defendant's change in stories during the interview was a common experience of his when interviewing homicide suspects. Defendant was also read his *Miranda* warnings an hour apart from each other prior to providing his written statement to the officers. Trooper Brady read the warnings verbatim to Defendant and testified that he further explained the rights available to Defendant prior to the oral interview and written statement. At no point in time did Defendant state his lack of understanding of the warnings. Additionally, the officers' testimony confirming mental awareness is further supported by three other witnesses who testified at the pretrial hearing. The amount of witness testimony supporting Defendant's cognitive awareness on the day of his arrest and interview does outweigh the inconsistent testimony provided only by Defendant. For these reasons, Defendant is found to have sufficient mental capacity at the time of giving his statement.

WHEREFORE, for these reasons, Defendant's Omnibus Pretrial Motion is hereby DENIED.

16