J-S71044-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DAVID EMPSON | : | |
| | : | |
| Appellant | : | No. 2532 EDA 2017 |

Appeal from the Judgment of Sentence July 11, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010509-2015

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DAVID EMPSON | : | |
| | : | |
| Appellant | : | No. 2594 EDA 2017 |

Appeal from the Judgment of Sentence July 11, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010518-2015

BEFORE:  PANELLA, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED FEBRUARY 19, 2019**

Appellant David Empson appeals from the judgment of sentence entered following his jury trial convictions for conspiracy, robbery, and terroristic threats.[1]  Appellant claims that the trial court erred by failing to grant his motion to suppress a statement he gave to police.  We affirm.

---

[1] 18 Pa.C.S. §§ 903, 3701(a)(1)(i), and 2706(a)(1), respectively.

The facts giving rise to Appellant's conviction are not in dispute and are stated in detail in the trial court's opinion. Appellant was arrested for the robbery of two different Rite Aid drugstores, one on September 4, 2015, and the second on September 6, 2015. Appellant was charged at two separate dockets. At docket CP-51-CR-0010509-2015, Appellant was charged with one count each of robbery, theft by unlawful taking,[2] receiving stolen property,[3] and terroristic threats for the robbery on September 6, 2015. At docket CP-51-CR-0010518-2015, Appellant was charged with three counts each of conspiracy, robbery, theft by unlawful taking, receiving stolen property, terroristic threats, possession of an instrument of crime (PIC),[4] simple assault,[5] and recklessly endangering another person (REAP)[6] for the robbery on September 4, 2015.

On October 28, 2016, Appellant filed a motion to suppress, asserting, in part,[7] that he did not voluntarily give a statement to police. At the suppression

---

[2] 18 Pa.C.S. § 3921(a).

[3] 18 Pa.C.S. § 3925(a).

[4] 18 Pa.C.S. § 907(a).

[5] 18 Pa.C.S. § 2701(a).

[6] 18 Pa.C.S. § 2705.

[7] The police searched the residence at the address associated with the vehicle Appellant used to travel to the robbery sites. Appellant challenged the results of the search, asserting that it was conducted without probable cause. The motion to suppress the search results was litigated before the Honorable Kai

hearing, the Commonwealth introduced into evidence the form that Appellant signed in which he waived his *Miranda* rights before giving his statement to police. *See* N.T. 4/28/17, Suppression Hr'g, at 37-39. On May 8, 2017, Judge Minehart denied Appellant's motion to suppress his statement. *See* Order, 5/8/17. Following a jury trial in which Appellant was convicted of conspiracy, robbery, and making terroristic threats, Appellant was sentenced to a total of twenty-five to fifty years of incarceration.[8]

Appellant filed a timely notice of appeal and concise statement of errors complained of on appeal under Pa.R.A.P. 1925(b), challenging the trial court's jury instructions, Judge Scott's failure to immediately recuse herself, and the denial of his motion to suppress the evidence recovered from the search of the residence and the statement he gave to police. *See* Statement of Matters Complained of on Appeal, 9/15/17, at 1-2 (unpaginated). On appeal, Appellant challenges only the denial of suppression of his statement to police.

---

Scott. On April 28, 2017, Judge Scott denied the motion regarding Appellant's attempt to suppress physical evidence from the search of the house. *See* Order, 4/28/17. Also on April 28, 2017, Judge Scott granted Appellant's motion to recuse, since she had previously represented Appellant's wife, Karima Choice, before becoming a judge. The matter was reassigned to the Honorable Jeffrey P. Minehart, who heard the motion to suppress regarding Appellant's statement to police.

[8] The robbery convictions subjected Appellant to a "third-strike" sentence for a third or subsequent crime of violence. *See* 42 Pa.C.S. § 9714(a)(2). Appellant was previously convicted of two other robberies. *See* N.T. Sentencing, 7/11/17, at 8.

Appellant raises one issue for our review: "Whether the trial court erred in failing to grant the motion to suppress Appellant's statement[.]" Appellant's Brief at 3.

Appellant asserts that

[g]iven the totality of the circumstances, Appellant[] did not knowingly, voluntarily and intelligently waive his **Miranda** rights regarding the statement that he gave. The police kept Appellant in a holding cell 8 hours prior to Appellant giving his statement. Appellant was not given anything to eat and he could not eat as he testified that he was on Methadone, he had not received his medication and his stomach was all messed up. He was under the influence of drugs and alcohol prior to his arrest and he was going through withdrawal symptoms. In addition[,] Appellant suffered from mental illness, bipolar and schizophrenia. Appellant was concerned that his 11[-]year[-]old son would not have a parent to take care of him as he and his son's mother were both arrested. Appellant pleaded for the release of his child's mother so that his son could go to school and told the detective that he would say or sign anything if his child's mother was released. Although the detective responded that he would see what he could do, under the circumstances, the detective coerced Appellant into giving his statement and/or given Appellant's physical and psychological health where he was held for 8 hours in a holding cell and undergoing withdrawal symptoms and had burning sensations in his chest, arms and legs and was taken to the hospital for an EKG, coupled with his expressed desire for his child to be reunited with his mother, Appellant's waiver of his **Miranda** rights cannot be said to be knowing, voluntary and intelligently entered into.

Appellant's Brief at 12-13 (citations omitted).

When we review the denial of a suppression motion, the following principles apply:

[O]ur initial task is to determine whether the [trial court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the

- 4 -

record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Bryant*, 67 A.3d 716, 724 (Pa. 2013) (citation omitted).

We note that

the test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression of the statement. This Court has set forth the following numerous factors that should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the duration and means of interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attendant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion.

*Id.* (citations omitted).

Regarding the length of time a defendant is in custody before giving a statement, we note that in *Bryant*, the appellant was in custody for approximately thirty hours before giving his statement to police. *Id.* at 725. The mere passage of time did not preclude the appellant's inculpatory statement from being admissible. *Id.* As to drug use and mental illness, neither is an automatic ground for suppression, particularly where the

defendant is coherent and does not show signs of mental illness. **See Commonwealth v. Ventura**, 975 A.2d 1128, 1138 (Pa. Super. 2009) ("[W]hen evidence of impairment is present, it is for the suppression court to decide whether the Commonwealth has established by a preponderance of the evidence that the suspect nonetheless had sufficient cognitive awareness to understand the **Miranda** warnings and to choose to waive his rights." (citation omitted)); **Commonwealth v. Mitchell**, 105 A.3d 1257, 1267 (Pa. 2014) ("[T]here is no *per se* rule that a defendant's waiver of his constitutional rights is defective merely because his mental illness distorts [the] defendant's perceptions of reality.").

Instantly, after our careful review of this matter, we conclude that the trial court's factual findings are supported in the record, and the court aptly analyzed the totality of the circumstances. Moreover, we discern no error in the court's legal conclusion that Appellant's statement was given voluntarily. **See Bryant**, 67 A.3d at 724. Accordingly, we affirm the judgment of sentence on the basis of the well-reasoned opinion of Judge Jeffrey P. Minehart, filed on October 16, 2017. **See** Trial Ct. Op., 10/16/17, at 9-13.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/19

**FILED**

OCT 16 2017

Office of Judicial Records
Appeals/Post Trial

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION-CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA

           v.

DAVID EMPSON

            OPINION

: PHILADELPHIA COURT
:
: OF COMMON PLEAS
: CRIMINAL TRIAL DIVISION
:
: CP-51-CR-0010509-2015
: CP-51-CR-0010518-2015
:
:
:
:



CP-51-CR-0010509-2015 Comm v Empson, David
Opinion

8016021131

## PROCEDURE HISTORY

Defendant, David Empson, was charged as of the above bills of information with, inter alia, three counts of robbery and terroristic threats and two counts of criminal conspiracy. These charges stemmed from two incidents that occurred on September 4, 2015, and September 6, 2015, during which defendant entered Rite Aid Drug stores and robbed them

Defendant was tried before this Court and a jury in May of 2017.[1] At the conclusion of the trial, the jury found defendant guilty of the above offenses. The robbery charges were graded as felonies of the first degree.

---

[1] Prior to trial this Court and the Honorable Kai Scott held hearings on defendant's suppression motions. Judge Scott and this Court denied those motions. Judge Scott has been asked, pursuant to Pa R.A P 1925(a) to file an opinion addressing claims raised by defendant in his Pa.R A.P. 1925(b) Statement questioning rulings she made following the suppression hearing conducted before her. Judge Scott recused herself after ruling on defendant's motion and the matter was administratively assigned to this Court for a hearing on defendant's motion to suppress his statement and for trial.

1

On July 11, 2017, this Court imposed an aggregated sentence of twenty-five to fifty years' incarceration. Following the imposition of sentencing, defendant, who did not file post-sentence motions, filed a timely notice of appeal as well as a requested Pa.R.A.P. 1925(b) statement.

## FACTUAL HISTORY

On September 4, 2015, at about 3:15 p.m., a male entered a Rite Aid Drug Store located at 4616 N. Broad Street, in Philadelphia, wearing a stocking over his head and Muslim garb, and approached the checkout counter. Ms. Cahcheral Stinson, an assistant manager at the store noticed the male and thought that something was amiss. Ms. Stinson immediately telephoned the store's loss prevention manager, who advised Ms. Stinson to call 911. She did so immediately but was ordered by the male to get off the phone.

As this was occurring, when the male reached the counter, he handed a cashier named Rosa a note that threatened to blow the brains out of the recipient of the note unless she gave the male all of the money and cigarettes.[2] Rosa handed the note to Ms. Stinson, who upon reading the note, put over $300.00 and several packs of Newport cigarettes in a bag that she surrendered to the male, who immediately fled the store and got into a the passenger side of a silver sedan with a Pennsylvania license plate that had the numbers and lettering scratched off of it.[3]

---

[2] The note stated·

> This is a stick-up, give me all the money in 1st and under drawer, if you press the silent alarm, I will blow your brains out; put a carton of Newports in the bag with money now

N T 5/9/17, 21.

[3] Upon being shown a photograph of a silver sedan, Ms. Stinson identified it as the vehicle she observed defendant enter. N.T 5/9/17, 22

2

After the male fled, the police interviewed Ms. Stinson. During the interview, she described the robber as being between 45-55 years of age, tall, dark complected, and skinny and having a lazy left eye, a red beard, a silver bracelet on his right wrist and missing teeth.

On September 6, 2015, Ms. Alysia Carter was an assistant manager at a Rite Aid Drug Store located at 1334 Windrim Avenue in Philadelphia, when shortly after 8:00 a.m., a bald man with reddish eyes and wearing Muslim garb, who had a scarf partially covering his face, entered the store. At the time Ms. Carter was preparing to open the store and the entry of the male into the store made her concerned. The male ordered Ms. Carter to approach him and with his hand behind his back, he said, "Give me what I want; I'm not trying to hurt nobody, just give me what I want." (N.T. 5/9/17, 42). That made her very nervous because she believed that the male was hiding a weapon.

Ms. Carter walked to the middle cash register at the check-out counter and took out $88.00 from it. She then gave the money to the male, along with numerous packs of Newport cigarettes, which he put it all in a Rite Aid bag. The male then ran out of the store and jumped into a tannish colored Buick that sped from the scene. Ms. Carter followed him outside and could only make a letter "J" on the license plate before the car went out of her sight. She also identified the car she had seen from a photograph shown her by the prosecutor.

On September 7, 2015, Mr. Alex Cherubin, a Rite Aid loss prevention employee at the Windrim Avenue Rite Aid, watched a video recording of the robbery that occurred the previous day and also spoke to Ms. Carter. He took particular interest in the physical characteristics of the robber and the car he fled in after the robbery.

3

Later that day, Mr. Cherubin was in the parking lot of the Rite Aid speaking to another employee when the vehicle the robber fled in the previous day pulled into the parking lot. Mr. Cherubin saw that a woman was driving and saw defendant, who was wearing a robe of some sort, get out of the car, go to the trunk, which had opened, retrieve a bandanna from it, and commence to wrap it around his face. Mr. Cherubin, immediately called the police because he believed that another robbery was about to occur. As he was speaking to a police dispatcher and telling them that he believed that the store was about to be robbed again, defendant got into the car and the driver quickly backed up and then sped from the parking lot. Before the car did so Mr. Cherubin memorized the license plate number.

Police arrive approximately five minutes later and asked Mr. Cherubin to go with them to another location. He agreed and upon arrival at the location he identified the car and defendant as being the car and the person he just had seen in the parking lot. When he identified defendant, defendant was no longer wearing the robe he had on when in the parking lot.[4]

Philadelphia Police Detective Britton Brown, who had been a police officer when the robberies occurred, was on routine patrol on September 7, 2015, with his partner, when they received a radio call announcing that there was a robbery in progress at the Windrim Avenue Rite Aid. The radio call described a vehicle and gave its license plate number. Upon getting the license plate number, Detective Brown did a computer search of the number and ascertained that it was registered to Karima Choice, defendant's wife,

---

[4] Mr Cherubin also identified a woman at the location where he was taken by police as being the same woman he saw driving the car  He also identified a photograph of the car, the same photograph of the car shown to Ms. Carter and Ms. Stinson, which they testified depicted the car they both saw speed from the stores following the robberies

4

who lived in the 4400 block of Cleveland Street. He and his partner immediately drove to that location and saw the car, a gold 2000 Buick, and defendant, who was bald, had a red beard, and was wearing a blue shirt, standing next to the car. In the detective's opinion, defendant matched the description of the male described in the radio call.

When the officers arrived on the block, defendant abruptly crouched down and then walked to a nearby vacant lot. The officers stopped defendant for investigation and radioed that they had done so. Soon thereafter, Mr. Cherubin arrived and identified defendant. Defendant was placed under arrest and transported to 35th District police station.

Following his arrest, defendant waived his rights under <u>Miranda</u>, and gave police a statement. In that statement defendant admitted that he was the person who robbed the Rite Aid stores on September 4 and 6, 2015, and who had gone to the Rite Aid on Windrim Avenue on September 7, 2015. During the interview defendant identified the note given to Ms. Stinson by the male as the one he handed to the cashier during the September 4, 2015, robbery.

Philadelphia Police Detective Justin Falcone was assigned along with other detectives to investigate the three incidents outlined above. In the course of doing so, search warrants were obtained for Ms. Choice's residence and for the Buick Regal. The search of the car yielded a black burqa style face mask. From the house, police seized three packs of Newport cigarettes, two firearm magazines, ammunition, proof of residence for defendant and Karima Choice, and a black, Muslim type garment, which was found in a bedroom in the residence.

5

Police detectives also obtained surveillance videos from the two Rite Aid stores. They recorded all three incidents as well as the perpetrators and videos of the vehicle used during the incidents. The vehicles used in each of the incidents appeared in the videos appeared to be similar.

## DISCUSSION

In the first complaint set forth in his 1925(b) statement, defendant asserts that this Court erred by refusing a request that the jury be instructed on second-degree robbery with respect to the robbery that occurred on September 6, 2015, because the robber said, "Do what I want, I ain't trying to hurt you."[5] Defendant's 1925(b) Statement, Issue 1. No relief should be granted with respect to this claim because the evidence failed to support the giving of the charge requested by defendant.

The law is clear that a trial court is only required to give a jury instruction on an offense when the evidence would reasonably support such a verdict. Commonwealth v. Walker, 36 A.3d 1, 15 (Pa. 2011); Commonwealth v Thomas, 717 A.2d 468, 478 (Pa. 1998). With regard to lesser included offenses, a defendant is entitled to such an instruction only when the evidence would permit the jury rationally to find the defendant guilty of the lesser included offense but not the greater offense. Commonwealth v. J.G. Thomas, 546 A.2d 116, 118 (Pa. Super. 1988) (en banc).

A person is guilty of robbery as a felony of the first degree if, "in the course of committing a theft, he ... (ii) threatens another with or intentionally puts him in fear of

---

[5] The witness testified that the robber said, ""Give me what I want; I'm not trying to hurt nobody, just give me what I want" (N.T 5/9/17, 42). Defendant's recitation in his 1925(b) statement of what the robber said is not quite correct. Nevertheless, regardless of what the robber may have said, no error occurred by denying defendant's request to instruct the jury on the elements of second degree robbery for the reasons discussed in the body of this opinion

6

immediate serious bodily injury." 18 Pa.C.S. §3701(a)(1)(ii) and (b). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. §2301. In contrast, robbery constitutes a felony of the second degree when a person, in the course of committing a theft, "inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury." 18 Pa.C.S. §3701(a)(1)(iv) (emphasis added). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. §2301.

Instantly, this Court suggests that the defendant's claim be deemed lacking in merit because the evidence did not support the giving of a charge on second-degree robbery. The only support defendant provides for this claim is his self-serving statement that he said during the robbery that he was not trying to hurt anyone. However, defendant conveniently omitted from his 1925(b) statement that when Ms. Carter, the victim of the second robbery, was confronted by him, he had his arm behind his back, which made Ms. Carter very nervous and afraid because she believed that he was concealing a weapon. (N.T. 5/9/17, 42). By conveying to the victim that he was armed, defendant clearly intended to have Ms. Carter believe that if she did not comply and give him what he wanted, he would use whatever he appeared to be hiding behind his back to cause her serious bodily injury. The threat worked because defendant's actions made Ms. Carter nervous and caused her to believe that if she failed to comply with his request that he was going to harm her. Because Ms. Carter believed that she was going to be assaulted with a weapon, her belief was sufficient to find that this was a threat to inflict serious bodily

7

injury, not mere bodily injury. Therefore the only degree of robbery rationally supported by the evidence was that of first-degree.

In Commonwealth v. Thomas, Thomas argued that he was entitled to a charge on second degree robbery because he had not been armed when he committed the robbery at issue as he only had a large lock under his shirt to simulate possession of a gun. The Superior Court rejected this claim, explaining:

> In simulating the possession of a gun, appellant was clearly aiming to instill in his victims the highest degree of fear. Faced with a deadly weapon, a victim fears, not just that he or she may be injured during the robbery, but that his or her very life is in danger. Appellant did not simply intend that the victims' fear of some bodily injury would prevent resistance; rather, he relied on the threat of a deadly weapon to insure compliance.

546 A.2d at 118. The Court concluded Thomas's crime was not made less serious by the fact he did not possess a "real" gun, but was only simulating one, and thus held "it would be both irrational and contrary to the aims of the [robbery] statute for the jury to be permitted to find appellant, who calculated that his victims would be in mortal fear of a deadly weapon, guilty only of the lesser offense of threatening mere bodily injury, but not guilty of threatening serious bodily injury." Id. at 119. See also Commonwealth v. Hurd, 407 A.2d 418, 420 (Pa. Super. 1979) (by placing hand in pocket and pointing it at victim manifested that robber intended to put victim in fear of serious bodily harm).

Instantly, as in Thomas, it would have been "irrational and contrary to the aims of the [robbery] statute" for the jury to find defendant guilty of second degree robbery given the inference raised by his actions during the robbery.

8

Accordingly, the court properly denied defendant's request to charge the jury on second-degree robbery, an offense not supported by the evidence.

In his second and last claim involving this Court, defendant argues that this Court erred by denying his motion to suppress his inculpatory statement to the police because it was not given voluntarily. In support of this claim, defendant contends that he did not give the statement voluntarily because he was suffering from mental illness and was under the influence of drugs at the time he tendered his statement and because he felt that he had to confess because his wife had also been arrested and he was afraid for the welfare of his child, who had no one to take care of him due to the arrests.

During the suppression hearing, Detective Brian Sanders testified that he was assigned to investigate the two robbery incidents outlined above and in the course of doing so he and a Detective Valentino came in contact with defendant inside a police station on September 7, 2015, at about 3:44 p.m.[6] Defendant was placed in Detective Valentino's cubicle at which time Detective Valentino, in Detective Sanders presence, orally gave defendant Miranda warnings. Defendant was then asked the seven questions posed to ascertain whether an interviewee understood his rights and was waiving them voluntarily. Defendant responded to them in a manner manifesting that he understood his right to remain silent and wanted to waive them and give a statement. Defendant, who appeared to be coherent and was calm and pleasant and who was fully cooperative with the detectives, was given water and was not threatened, promised anything, or coerced in

---

[6] Defendant was brought to the station at about 8:30 a.m., and was held in the station's cell room until about 3 44 p m.

9

any way to waive his rights or to give a statement.[7] Although he appeared not to be under the influence of drugs or alcohol, defendant said he was but that he was capable of answering simple questions.[8]

After defendant waived the Miranda rights, he gave a police a four-page statement, during the interview, which concluded about 4:24 p.m. Once the interview ended and the statement was complete, defendant was given an opportunity to review the statement and make corrections or amendments. Upon reviewing it defendant did make an addition to the statement. He also signed each page of the statement and the pages upon which his responses to the seven questions concerning the Miranda warnings were recorded.

Defendant testified during the suppression hearing. He indicated that his wife was taken in custody when he was and that his then eleven year-old son witnessed the arrest. He accused Detective Valentino of threatening him that if he did not "come clean" his wife would not be leaving the police station and said that he told Detective Valentino that he had a son and begged him to let her go so she could take his son to school the next day.

Defendant further testified that he was taken to a hospital after he was arrested and prior to the interview for a perceived heart problem he had been suffering from for a couple of days. He also related that he was taking several prescribed medications and did

---

[7] While cross-examining Detective Sanders, defense counsel attempted to suggest that the detectives used the arrest of defendant's wife and the existence of his child as leverage to obtain a statement from defendant Detective sanders denied the accusation and said that he was not aware that he had a child.

[8] On cross-examination, Detective Sanders testified that defendant said that he was under the influence of alcohol, Methadone, and Oxycontin and committed the robberies to get drugs The detective conceded that he did not consider defendant could be suffering from withdrawal having been in custody for several hours. He also conceded that defendant was not asked if he was suffering from a mental illness. The detective id indicate that defendant was asked whether he wanted to say anything else and did not mention a child or mental health issues.

10

not receive his prescriptions that day.[9] He indicated that he suffered from schizophrenia and was bipolar. He added that he had suffered a head injury while working with his father and that shortly prior to his arrest, several members of his wife's family died from drug overdoses, which required him to take over family duties and responsibilities because she could not function.

The law provides that a suspect may waive his right to remain silent and provide a statement to police, but that the waiver must be knowing, voluntary and intelligent. Commonwealth v. DeJesus, 787 A.2d 394, 4012 (Pa. 2001), cert. denied, 537 U.S. 1028 (2002). "In other words, the waiver must be 'the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " Id. (citation omitted). In determining whether to suppress a confession. "the touchstone inquiry is whether the confession was voluntary," and voluntariness is determined after reviewing the totality of the circumstances surrounding the confession Commonwealth v. Nester, 709 A.2d 879, 882 (Pa. 1998). In assessing the totality of the circumstances, the court should consider the following factors: the duration and means of interrogation; the defendant's physical and psychological state, the conditions attendant to the detention; the attitude of the interrogator; and any other factors that could drain a person's resistance to suggestion and coercion. DeJesus, supra,

---

[9] Defendant stated that he was taking Methadone, Percocets, and Xanax, and Risperdal, all of which had been prescribed for him, and that he was taking more than the prescribed dosages at the time of the incidents herein. He conceded that when asked what drugs he was taking during the interview he did not mention many of them and that he had stopped taking some of them. He also conceded that while at the hospital, nothing was found wrong with him and that he was released within a half hour of arriving.

11

787 A.2d at 403. Further, the Commonwealth bears the burden of proving that the defendant voluntarily confessed. Nester, supra, 709 A.2d at 882.

When impairment of a suspect is an issue, the test to be employed is whether the defendant, "had sufficient mental capacity at the time of his [making the statements] to know what he was saying and to have voluntarily intended to say it." Commonwealth v. Edwards, 555 A.2d 818, 826 (Pa. 1989), quoting Commonwealth v. Smith, 291 A.2d 103, 104 (Pa. 1972). Thus, the fact that a defendant had been drinking or was otherwise under the influence of any potentially mind-altering substance before an arrest does not automatically render any statements inadmissible. Id.

It is further noted that that there is no *per se* rule that an individual with a mental illness or deficiency is incapable of validly waiving his constitutional rights and giving a voluntary confession. Commonwealth v. Glover, 412 A 2d 855, 858 (Pa. 1980). Rather, the determination as to whether a knowing, voluntary and intelligent waiver was effected is made by reviewing the totality of the circumstances. See Nester, 709 A.2d at 882, 884-85 (although defendant claimed he was in confused psychological state when he confessed to robbery, court found totality of circumstances, including testimony that defendant was alert and able to answer questions in a coherent manner, sufficient to show that confession was voluntary); Commonwealth v. Logan, 549 A.2d 531, 537 (Pa. 1988) (plurality) (despite defendant's mental illness, the Court found that the waiver of rights was knowing, voluntary and intelligent where uncontested police testimony showed that defendant was read his Miranda rights, asked for clarification and stated he understood each warning, that he could read and write and denied recent drug use, and that he was not coerced into making confession); Commonwealth v. Bracey, 461 A.2d 775, 782 n. 7

12

(noting that "a person with mental illness including a history of hallucinations and delusions may be capable of waiving her constitutional rights").

Here, defendant maintains that even though he was given <u>Miranda</u> rights, which he waived after averring that he understood them, and then signed the waiver form, his statement was not knowingly, voluntarily, and intelligently proffered based on the reasons cited above, namely mental illness, drug use, and coercion based on the then existing circumstances. This Court respectfully submits that a review of the evidence presented at the suppression hearing does not substantiate defendant's claims and instead supports this Court's conclusion that defendant's statement was determined to be not suppressible.

That conclusion is premised on the fact that defendant failed to mention all of the drugs he alleged he was taking or his mental illness. It is also based on the credible testimony given by Detective Sanders that defendant did not appear to be under the influence or unaware of what was occurring. Accordingly, based on these reasons and the reasons set forth by this Court following the suppression hearing, it is respectfully suggested that if this claim is raised on appeal that it be deemed lacking in merit.

## CONCLUSION

For the foregoing reasons, the defendant's assertions of error should be dismissed for lack of merit and the order entered in this matter should be affirmed.

By the Court,

DATE: 10/16/17

Honorable Jeffrey P. Minehart

13